629 A.2d 831

MORTON INTERNATIONAL, INC., SUCCESSOR TO MORTON THIOKOL, INC., NOW NAMED THIOKOL CORPORATION, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, A PENNSYLVANIA CORPORATION (SUCCESSOR TO THE POTOMAC INSURANCE COMPANY AND THE UNITED STATES BRANCH OF GENERAL ACCIDENT FIRE AND LIFE ASSURANCE CORPORATION, LTD.); AFFILIATED FM INSURANCE COMPANY, A RHODE ISLAND CORPORATION; CONTINENTAL CASUALTY COMPANY, AN ILLINOIS CORPORATION; FIRST STATE INSURANCE COMPANY, A DELAWARE CORPORATION, DEFENDANTS–RESPONDENTS, AND LIBERTY MUTUAL INSURANCE COMPANY, A MASSACHUSETTS CORPORATION; AMERICAN HOME ASSURANCE COMPANY, A NEW YORK CORPORATION; INSURANCE COMPANY OF NORTH AMERICA, A PENNSYLVANIA CORPORATION; UNDERWRITERS AT LLOYD'S LONDON, AND CERTAIN SUBSCRIBING LONDON MARKET INSURANCE COMPANIES, DEFENDANTS–RESPONDENTS AND CROSS–APPELLANTS, AND AETNA CASUALTY & SURETY COMPANY, A CONNECTICUT CORPORATION; AMERICAN CENTENNIAL INSURANCE CO., A DELAWARE CORPORATION; FIREMAN'S FUND INSURANCE COMPANY, A CALIFORNIA CORPORATION; GRANITE STATE INSURANCE COMPANY, A NEW HAMPSHIRE CORPORATION; THE HARTFORD ACCIDENT & INDEMNITY COMPANY, A CONNECTICUT CORPORATION; INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, A PENNSYLVANIA CORPORATION; INTEGRITY INSURANCE COMPANY, A NEW JERSEY CORPORATION; INTERNATIONAL INSURANCE COMPANY, AN ILLINOIS CORPORATION; LEXINGTON INSURANCE COMPANY, A DELAWARE CORPORATION; MIS-

1

SION INSURANCE COMPANY, A CALIFORNIA CORPORA-
TION; MISSION NATIONAL INSURANCE COMPANY, A CALI-
FORNIA CORPORATION; NATIONAL UNION FIRE INSUR-
ANCE COMPANY OF PITTSBURGH, A PENNSYLVANIA COR-
PORATION; AND NORTHBROOK INSURANCE COMPANY, AN
ILLINOIS CORPORATION, DEFENDANTS.

Argued November 30, 1992—Decided July 21, 1993.

4

*George F. Kugler, Jr.,* argued the cause for appellant and cross-respondent (*Archer & Greiner,* attorneys; *Mr. Kugler, Edward C. Laird,* and *Gary J. Lesneski,* on the briefs).

*Elliott Abrutyn* argued the cause for respondent General Accident Insurance Company of America (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski,* attorneys; *Mr. Abrutyn* and *Timothy Saia,* on the brief).

*William S. Wachenfeld* argued the cause for respondent Affiliated FM Insurance Company (*Mendes & Mount,* attorneys for Affiliated FM Insurance Company, and *DeCotiis & Pinto,* attorneys for First State Insurance Company; *Mr. Wachenfeld, Rose-*

*mary A. Juster, James A. Farber,* and *Robert F. Walsh,* on the brief).

*John C. Sullivan* argued the cause for respondent and cross-appellant Liberty Mutual Insurance Company (*Manta and Welge,* attorneys).

*Paul R. Koepff,* a member of the New York Bar, argued the cause for respondents and cross-appellants Underwriters at Lloyd's London, and certain subscribing London Market Insurance Companies (*Ronca, McDonald & Hanley,* attorneys for Underwriters at Lloyd's London; *Mudge, Rose, Guthrie, Alexander & Ferdon,* attorneys for Insurance Company of North America; and *Golden, Rothschild, Spagnola & DiFazio,* attorneys for American Home Assurance Co.; *Mr. Koepff, Robert J. Kovacs, Paul A. Leodori, W. Cary Edwards, Stephen V. Kovarik,* and *Charles W. Miller, III,* of counsel).

*Eugene R. Anderson,* a member of the New York Bar, argued the cause for *amicus curiae* New Jersey State League of Municipalities (*Stickel, Koenig & Sullivan* and *Anderson, Kill, Olick & Oshinsky,* attorneys; *Mr. Anderson, John A. MacDonald, Ralph J. Kmiec,* and *Michael A. Pane,* of counsel; *Mr. MacDonald* and *Fred G. Stickel, III,* on the brief).

*Richard F. Engel,* Deputy Attorney General, argued the cause for *amicus curiae* State of New Jersey (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel; *Karen L. Jordan* and *John F. Dickinson, Jr.,* Deputy Attorneys General, on the brief).

*John P. Cascio* submitted a letter in lieu of brief on behalf of respondent Continental Casualty Company (*Chasan, Leyner, Tarrant & Lamparello,* attorneys).

*Clyde A. Szuch, Donald W. Kiel, Paul E. Breene, Michael L. Rodburg, Albert G. Besser,* and *Jerry Fitzgerald English* submitted a brief on behalf of *amici curiae* Allied Signal, Inc., The American Fiber Manufacturers Association, The American Petroleum Institute, Armstrong World Industries, Inc., Athlone Industries, Inc., The BOC Group, Inc., The Chemical Manufacturers

Association, Hanson Industries, International Business Machines Corporation, J.T. Baker, Inc., Nestle Food Company, Olin Corporation, Public Service Electric & Gas Company, Reichhold Chemicals, Inc., Rohm and Haas Company, Safety Light Corporation, Sandvik, Inc., Schering–Plough Corporation, USR Industries Inc., Warner–Lambert Company, Waste Management, Inc., and Westinghouse Electric Corporation (*Hannoch Weisman*, attorneys for The American Fiber Manufacturers Association, The American Petroleum Institute, The Chemical Manufacturers Association, International Business Machines Corporation, Olin Corporation, Rohm and Haas Company, Hanson Industries, Safety Light Corporation, and USR Industries, Inc.; *Anderson, Kill, Olick & Oshinsky*, attorneys for Allied–Signal, Inc., The BOC Group, Inc., Reichhold Chemicals, Inc., and Schering–Plough Corporation; *Lowenstein, Sandler, Kohl, Fisher & Boylan*, attorneys for Westinghouse Electric Corporation; *Kerby, Cooper, English, Danis & Garvin*, attorneys for Waste Management, Inc.).

*Victor C. Harwood, III*, submitted a brief on behalf of *amicus curiae* Aetna Casualty & Surety Company (*Harwood Lloyd*, attorneys; *Mr. Harwood, Brian J. Coyle*, and *Edward Zampino*, on the brief).

*Wendy L. Mager* submitted a brief on behalf of *amicus curiae* Insurance Environmental Litigation Association (*Smith, Stratton, Wise, Heher, Brennan*, attorneys).

The opinion of the Court was delivered by

STEIN, J.

This case concerns insurance coverage for environmental pollution. The events affecting the coverage claims before us span a period of several decades, in the course of which societal indifference concerning environmental-pollution damage has been supplanted by a heightened awareness of the need for environmentally-sound waste-disposal practices and an increasingly aggressive governmental effort to remediate the consequences of past environmental damage. That evolution understandably has influenced the insurance industry's concern about its exposure for damages

caused by environmental pollution, and has resulted in an industry-wide determination to modify the scope of insurance coverage for such damages.

The claims for coverage involve Comprehensive General Liability (CGL) policies covering plaintiff and its predecessors during the period 1961 to 1976, issued by three primary carriers and a large number of excess carriers. Four principal variations of CGL policies are involved, and no dispute exists concerning the language of the critical provisions that affect the question of coverage. Because the policies are essentially standardized, industry-wide forms, our interpretation of their coverage provisions may affect significantly the allocation of damages for environmental pollution of New Jersey property among insurance carriers, industry, and government. The scope of the relief sought by plaintiff requires us to consider not only the kinds of pollution-causing events entitled to coverage under the various policies, but also whether remediation expenses and response costs imposed under the authority of federal and state environmental statutes constitute sums that the insured is legally obligated to pay "as damages" because of property damage covered by the policies. Because the economic consequences are significant, the issues before us already have generated a multiplicity of reported decisions by federal and state courts.

I

The procedural history and material facts are set forth in abundant detail in the Appellate Division's comprehensive and thoughtful opinion. *Morton Int'l v. General Accident Ins. Co.*, 266 *N.J.Super.* 300, 629 *A.*2d 895 (1991). A useful perspective concerning that history and those facts is afforded by this Court's opinion in *New Jersey Department of Environmental Protection v. Ventron Corp.*, 94 *N.J.* 473, 468 *A.*2d 150 (1983). Plaintiff, Morton International, Inc. (plaintiff or Morton), is the successor in interest to Ventron Corporation (Ventron), and the claims it now asserts derive from liability imposed on Ventron in that litigation.

The Department of Environmental Protection (DEP) had instituted suit against Ventron and other defendants, Velsicol Chemical Corporation (Velsicol), Wood Ridge Chemical Corporation (Wood Ridge), and F.W. Berk and Company (Berk), to compel the defendants to bear the costs involved in remediating pollution of Berry's Creek, an estuary of the Hackensack River, that had been caused by discharges from a mercury-processing plant operated for over forty years by the various defendants. Justice Pollock's opinion graphically described the end result of the defendants' prolonged discharge of mercury and other pollutants:

> Beneath its surface, the tract is saturated by an estimated 268 tons of toxic waste, primarily mercury. For a stretch of several thousand feet, the concentration of mercury in Berry's Creek is the highest found in fresh water sediments in the world. The waters of the creek are contaminated by the compound methyl mercury, which continues to be released as the mercury interacts with other elements. Due to depleted oxygen levels, fish no longer inhabit Berry's Creek, but are present only when swept in by the tide and, thus, irreversibly toxified.

[*Id.* at 481–82, 468 *A*.2d 150.]

This Court determined that the discharging of toxic mercury constituted an abnormally-dangerous activity, and imposed strict liability under common-law principles against all the defendants for remediation of the resulting nuisance and property damage. *Id.* at 493, 468 *A*.2d 150. We also held that all the defendants were jointly and severally liable under the Spill Compensation and Control Act of 1977 (Spill Act), *N.J.S.A.* 58:10–23.11 to –23.11z, as amended, *L.* 1977, *c.* 346, § 4, and that such liability would apply retroactively to discharges that had occurred prior to the Spill Act's effective date. *N.J.S.A.* 58:10–23.11f(b)(3) (as amended, *L.* 1979, *c.* 346, § 4; *L.* 1981, *c.* 25, § 1). *Id.* at 496–99, 468 *A*.2d 150. Finally, we affirmed the judgment entered on the cross-claim asserted by Robert and Rita Wolf, purchasers of the plant property from Ventron, premised on Ventron's fraudulent nondisclosure that the property had been contaminated by mercury pollution. *Id.* at 503–04, 468 *A*.2d 150.

When DEP instituted its action against Ventron, the insurers of the various owners and operators of the mercury-processing plant

disclaimed coverage, requiring Ventron to retain counsel to provide a defense. At the conclusion of that litigation Morton, as Ventron's successor, commenced this declaratory-judgment action, seeking reimbursement for the costs incurred in defending the suit filed by DEP and the cross-claim filed by the Wolfs, as well as indemnity for the cleanup and remediation expenses resulting from the DEP proceeding. Defendants are the primary and excess insurers of Ventron and its predecessors during the period with respect to which Morton seeks reimbursement and indemnity.

Early in the litigation, the trial court granted partial summary judgment in favor of all defendants concerning their obligation to defend and indemnify Ventron with respect to the Wolfs' cross-claim. The parties filed cross-motions for summary judgment on the remaining issues: defendants asserted that the record presented no material disputed factual issue concerning whether Morton's predecessors had intended or expected to cause property damage, whereas Morton contended that the Chancery Division was bound by the trial court's determination in *Ventron* that no intent "to pollute the waters of the State" had been proved. Those motions resulted in a ruling by the Chancery Division that none of the defendants was obligated to indemnify Morton for the costs of remediation of environmental damage—the amount of which remains undetermined—that were imposed on Ventron in the DEP litigation. Only General Accident Insurance Company of America (General Accident) was held liable for a portion of Ventron's costs in defending the DEP suit. In a separate trial, Morton was awarded judgment against General Accident for approximately $100,000 for such defense costs, plus attorneys' fees for prosecuting the claim to recover those costs. On appeal, the Appellate Division affirmed the Chancery Division's judgment dismissing Morton's claims for indemnification, and reversed that portion of the judgment awarding damages and counsel fees against General Accident. We granted Morton's petition for certification and the joint cross-petition for certification of defendants Insurance Company of North America, American Home

Assurance Co., Liberty Mutual Insurance Co., Certain Underwriters at Lloyd's, London, and Certain London Markets Insurance Companies, 127 *N.J.* 563, 606 *A.*2d 374 (1992).

### A. *Insurance Coverage*

For purposes of the summary-judgment motions, no issue was raised concerning which insurers provided primary and excess coverage during the pertinent periods. Similarly, the relevant provisions of the various policies also appear to be undisputed.

### *Primary Insurance Coverage*

1. Defendant General Accident has stipulated that it and its affiliate provided primary general-liability coverage from October 1960 to October 1971. (Although copies of the policies actually issued to Morton's predecessors were not produced, the record contains sample forms of policies used by General Accident that the parties acknowledged, for purposes of summary judgment, corresponded to the actual policies.) Three different policy forms were in use by General Accident during this period.

(a) From October 1960 to October 10, 1964, General Accident's policy provided property-damage-liability coverage for "all sums which the Insured shall become legally obligated to pay * * * for damages because of injury to or destruction of property * * * caused by accident." The term "accident" was undefined. The policy afforded coverage "only to occurrences or accidents which happen during the policy period * * *."

(b) Effective October 10, 1964, the prior form of policy was amended by deleting the words "caused by accident" and substituting the words "resulting from an occurrence." The endorsement also added the following definition of occurrence:

The word "occurrence" as used in this endorsement means an unexpected event or happening which results in injury to or destruction of tangible property during the policy period, or a continuous or repeated exposure to conditions which result in injury to or destruction of tangible property during the policy period provided the insured did not intend or anticipate that injury to or destruction of property would result * * *.

(c) Effective October 1, 1966, and continuing through October 1971, General Accident's policy revised the definition of occurrence as follows:

"Occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

2. Although neither the record nor the opinions below indicates the source of Ventron's CGL coverage from October 10, 1971, to June 1972, primary CGL coverage was provided from June 14, 1972, through January 1, 1975, pursuant to three policies issued by Reserve Insurance Company (Reserve), which had been declared insolvent and liquidated prior to the institution of this litigation. Each of Reserve's policies provided coverage for "all sums which the Insured shall become legally obligated to pay as damages because of property damage * * * caused by an occurrence," and their definition of "occurrence" was substantially identical to the definition contained in General Accident's policies from October 1966 to 1971. Reserve's policies for the period June 14, 1973, to June 14, 1975, however, contained a so-called "pollution-exclusion clause" that was identical to exclusion "f" of the standard form CGL policy (standard pollution-exclusion clause), see, e.g., Insurance Services Office ("ISO") form GL 00 02, Ed. 01–73, that had been widely used by insurers from 1973 to 1985. That exclusion stated:

This insurance does not apply * * * (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

3. Liberty Mutual Insurance Company (Liberty Mutual) provided primary CGL coverage to Ventron from January 1, 1975, through January 1, 1977. Its policies afforded coverage for "all sums which the insured shall become legally obligated to pay as damages because of * * * property damage * * * caused by an occurrence." The policies defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which

results in * * * property damage neither expected nor intended from the standpoint of the insured * * *." The Liberty Mutual policies also contained the standard pollution-exclusion clause.

## Excess Insurance Coverage

Although the record is incomplete concerning the periods of coverage and the material terms of all the excess insurance coverage that Ventron and its affiliates purchased during the relevant period, we set forth a brief summary of that coverage and, where available, the material provisions affecting coverage.

1. (1972–1978)

Defendant Affiliated FM Insurance Company (Affiliated FM) provided first-layer excess-liability coverage from March 1, 1972, to January 1, 1978, pursuant to two policies. The initial policy defined "occurrence" to mean "either an accident happening during the policy period or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period." The renewal policy defined "occurrence" as "an accident including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the insured." Affiliated FM's policies also contained the standard pollution-exclusion clause.

Defendant First State Insurance Company provided second-layer excess coverage from March 1, 1972, to March 1, 1975. Its policy contained the same definition of "occurrence" as was contained in the initial Affiliated FM policy and also included the standard pollution-exclusion clause.

From March 1, 1975, to March 1, 1978, defendant American Home Insurance Company provided second-layer excess coverage. Its policies followed the form of the policies issued by Affiliated FM, the first-layer excess carrier, and contained the standard pollution-exclusion clause.

2. (1966–1972)

Defendant Insurance Company of North America (INA) apparently provided first-layer excess coverage to Ventron and its affiliates from March 17, 1966, to March 1, 1972, pursuant to four policies. By stipulation, claims asserted under the second policy covering the period March 17, 1969 to March 9, 1970, have been dismissed. Under the initial policy, "occurrence" was defined to mean "either an accident happening during the policy period or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to or destruction of property during the policy period." The third and fourth policies defined "occurrence" to mean "an injurious exposure to conditions which results, during the policy period, in personal injury, property damage or advertising injury neither expected nor intended from the standpoint of the insured." The initial INA policy, in effect from 1966 to 1969, contained a non-standard pollution-exclusion clause that provided:

Waste Disposal Exclusion. It is agreed that this policy shall not apply * * * to injury to or destruction of property resulting from the intentional or willful disposal of any waste products, fluids or materials.

The third and fourth policies contained a different non-standard pollution-exclusion clause:

This insurance does not apply: to bodily injury, personal injury or property damage arising out of pollution or contamination under that (1) caused by oil, or (2) caused by the discharge or escape of any other pollutants or contaminants, unless such discharge or escape results from a sudden happening during the policy period, neither expected nor intended from the standpoint of the insured.

Defendants Certain Underwriters at Lloyds, London and Certain London Markets Insurance Companies also provided excess coverage from November 1, 1966, to February 1, 1970, under two policies insuring against liability for property damage arising out of an "occurrence," defined to mean "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in * * * property damage * * * during the policy period." Those policies did not contain a pollution-exclusion clause.

3. (1960–1961)

Defendant Continental Casualty Company provided first-layer excess-liability coverage to Morton's predecessors from January 1960, to January 1961, for property-damage liability arising out of an "occurrence," defined to mean "an event, or continuous or repeated exposure to conditions, which unexpectedly or unintentionally caused injury, damage or destruction during the policy period." That policy contained no pollution-exclusion clause.

Defendants Certain Underwriters at Lloyds, London and Certain London Markets Insurance Companies also provided second- and third-level excess coverage under two policies covering the period from March 15, 1960, to March 15, 1961, but the record is unclear concerning which of two different pollution-exclusion clauses those policies adopted. One of the clauses excludes

liability imposed by law on the assured for * * * (3) property damage caused by seepage, pollution or contamination unless (a) such seepage, pollution or contamination is caused by accident and results in property damage during the period of the policy, or (b) subsequent to seepage, pollution or contamination an accident ensues which causes property damage during the period of the policy and then only for property damage proximately caused by such accident.

The other clause excludes liability imposed by law on the assured for "personal injuries or property damage resulting from any gradual cause such as subsidence, seepage, pollution or contamination." Our disposition does not require us to determine which clause was in force.

### B. *Factual Background Pertinent to Resolution of Morton's Coverage Claims.*

The Appellate Division concluded, based on its examination of the extensive record, that the trial court properly had determined as a matter of law that Morton's predecessors had intended to cause environmental damage. 266 *N.J.Super.* at 333, 629 *A.*2d at 913. Before us, Morton asserts that the Appellate Division improperly "inferred intentional consequences" on the basis of "the intentional character of the acts of disposal," and contends that summary judgment was inappropriate in view of the sharply-conflicting evidence concerning the subjective knowledge and intent of Morton's predecessors. Morton also relies on the *Ventron*

trial court's finding that the evidence in that case did not demonstrate an "intent to pollute":

Surely Berk and W.R.C.C. intended to and volitionally did manufacture mercury compounds and dump waste on the Velsicol property. However, the Court cannot find that the acts were done with the intent to pollute the waters of the State or with the knowledge that such an invasion was substantially certain to occur. No such knowledge or intent may be imputed to defendants under an intentional tort theory.

Based on the *Ventron* trial court's conclusion, Morton argues that at the very least a triable issue of fact was presented with respect to the subjective intent of Morton's predecessors.

We offer those preliminary observations to afford a perspective for the discussion to follow. Both the Chancery Division, as well as the Appellate Division, in concluding that Morton's predecessors inevitably had "intended to pollute Berry's Creek," 266 *N.J.Super.* at 333, 629 *A.*2d at 913, relied heavily on the conclusions reached by this Court in *Ventron,* based on expert testimony at trial, that "the tract is saturated by an estimated 268 tons of toxic waste, primarily mercury," 94 *N.J.* at 481, 468 *A.*2d 150, and "[t]he contamination at Berry's Creek results from mercury processing operations carried on at the site for almost fifty years." *Id.* at 482, 468 *A.*2d 150. However, the record evidence relied on by the Chancery Division to demonstrate that Morton's predecessor had intended or expected environmental damage contains few references to mercury discharge, particularly during the 1950s and early 1960s. Rather, the record reflects that from the mid–1950s until institution of the *Ventron* suit, State officials consistently informed Morton's predecessors that they were discharging "unacceptable" emissions into Berry's Creek, accompanying those remonstrances with periodic reports analyzing the chemical content of the mercury plant's emissions. State officials insisted that remedial action be taken, but their warnings resulted only in a prolonged course of evasive action by the operating companies. The record reveals that not until 1970, however, did company officials expressly acknowledge that the "unacceptable" emissions had included discharges of mercury.

We first identify the relevant operating and parent companies. Berk operated the mercury-processing plant from 1929 to 1960, on a forty-acre tract west of Berry's Creek. In 1960, Wood Ridge, a wholly-owned subsidiary of Velsicol, purchased Berk's assets, including the property, and proceeded to operate the plant until 1974. In 1967, Wood Ridge distributed thirty-three of the forty acres to Velsicol but was permitted to dispose of waste on Velsicol's portion of the tract. Ventron acquired all of Wood Ridge's capital stock in 1968, continuing to operate the plant until 1974, when it sold the plant assets to a chemical company and the 7.1–acre tract on which the plant had been located to Rita and Robert Wolf.

For a detailed summary of those portions of the record demonstrating knowledge by Morton's predecessors that their emissions into Berry's Creek were deleterious and unacceptable, as well as their failure over almost two decades to take remedial measures, we cannot improve on the Appellate Division's recapitulation of the documentary evidence, from which we quote at length:

The record before Judge Huot demonstrated that as early as 1956 plaintiff's predecessor was informed that the effluent from the mercury processing plant contained an unacceptable level of pollutants. A report filed by two senior State Health Department public health engineers on April 9, 1956 detailed the results of their inspection of the property. These inspectors found that the plant consumed 60,000 gallons of water per day, about 90% of which was used for cooling purposes. Industrial wastes were produced from three buildings and consisted mostly of cooling water which had a high solid content, mainly insoluble dimethylcithiocarbonates which are organic and inorganic mercury compounds. The waste passed through a sedimentation tank from which the settled solids were recovered and reprocessed. The effluents from the settling tanks combined into a private sewer which discharged into an open ditch about 1200 feet from the plant, which in turn discharged the effluent into Berry's Creek at a point 2500 feet from the plant. Both public health engineers concluded that the combined effluent from the plant had an unacceptably high level of suspended solids and that the settling tank serving the effluent from one of the buildings was not large enough.

On December 2, 1958 one of the public health engineers, John Wilford, again visited the property "to ascertain the current status of their program for the treatment or disposal of their industrial wastes in order to eliminate pollution of Berry's Creek." He reported that the company had not been successful in persuading the Wood–Ridge Sewage Treatment Plant to accept plaintiff's wastes. Wilford made an inquiry about having a large settling tank constructed with an outfall to Berry's Creek. Nothing about the processing at the plant had changed.

Wilford explained to the company's vice-president that a settling tank would not, itself, reduce the pollution to acceptable limits and that if the company intended to continue discharging effluent into Berry's Creek it would have to submit plans and specifications to the Department of Health for approval. Wilford admonished the corporate official "that as this matter has been brought to [his] attention over two years ago, this department has a right to expect some appreciable progress toward the elimination of this problem." A four-point course of action was outlined to the company to which its vice-president agreed to comply. By March 17, 1959, however, it was clear to Wilford the company had made no progress "toward eliminating the polluting industrial waste therefrom from Berry's Creek." According to Wilford, the company was "cognizant" that its wastes contained mercury compounds which had to be removed.

In September 1959 and again in February 1960 Edward Griche, Inc. conducted an investigation into the nature of the waste emitted by the plant and the type of treatment which would clean the effluent. Both reports showed that the effluent from the processing plant contained many "deleterious characteristics" which included high suspended solids concentration. The report explored several treatment methods, some of which had proven to be highly successful and relatively cheap.

The State Department of Health again inspected the premises on February 4, 1960 taking samples of the industrial waste effluent for the purpose of determining "the current pollutional potential of the wastes." The written report which issued after that inspection showed that the "pollutional aspect" of the company's wastes first came to the attention of the State Department of Health in 1956. Although the report indicates that the company was "very cooperative" and "desirous of rectifying the present pollution," it had yet to decide what type of treatment facility to install and was unable to negotiate for waste disposal with the Borough of Wood–Ridge. Samples of the effluent were taken from three buildings on the premises with a report noting that "no treatment as such is afforded the industrial wastes." The conclusion of this report, as in an earlier report, stated "the combined industrial wastes effluent from S.W. Berk & Company is unacceptable for discharge into Berry's Creek." The report warned that the decision as to the type of waste treatment to be effected had been under consideration for several years; the author threatened legal action to secure compliance with the pertinent statutes.

By March 22, 1960 the company knew that the municipal sewerage system would not be able to handle its wastes, even with pretreatment. A letter from the company to the Department of Health indicated, however, that the company was seeking "professional help on design of a treatment plant." By May 1960 it appeared that Velsicol would purchase Berk's property and assets. Velsicol was informed of the State Department of Health's inspection report of February 1960 and was told that Berk had been "planning to make certain installations to reduce the amount of pollution resulting from its operations. . . ." The sale was completed and the company's name changed to Wood–Ridge Chemical Corporation in July 1960. The State Department of Health again inspected the premises in August 1960 and issued a written report which noted that, despite the name change, "the official personnel remain the same as do also the chief production processes." At

the time of this inspection, however, the plant was closed with full production expected to resume by October. Consequently, no sampling of waste was possible and the report merely noted that all production units produced wastes which flowed through a series of settling basins and united in a common ditch leading to Berry's Creek just below the outfall of the Wood–Ridge Sewerage Treatment Plant. Settling was the only treatment of the waste provided and it was observed that some of the settling basins were in need of cleaning. Again, the company represented to department officials that it was "now planning to construct its own treatment devices."

The plant was again inspected on December 5, 1960. The department's analysis of the plant's effluents indicated "a deleterious waste due chiefly to its high turbidity, suspended solids and ether soluble content." The effluent sample taken during the December 1960 visit was removed from a 5–foot deep, 40–foot square lagoon which had recently been excavated behind the industrial property. That lagoon received all the industrial waste effluents from the plant buildings and acted as an additional settling tank with an average detention period of about two days. The lagoon effluent emptied into Berry's Creek through an underground storm drain pipe. The report concluded with the suggestion that the company proceed with its plans to install additional waste treatment equipment on the premises in order to provide a nonpolluting final effluent.

In February 1964 the State's supervising engineer for the stream pollution control program wrote to the corporation's vice-president observing that a year prior the company informed the State Department of Health that it had contracted with consulting engineers to design suitable industrial waste treatment facilities to treat the lagoon effluent. The State complained that it received no engineering studies or proposals with respect to treatment facilities. Cautioning that the lagoon was nothing more than a temporary or preliminary step leading to treatability studies on the plant's effluents, Wood–Ridge Chemical was directed to advise the State of its treatment program status and when completion of a satisfactory facility would occur. In response, the company forwarded a "report on industrial waste treatment facilities, Wood–Ridge Chemical Corporation," authored by Clinton Bogert Associates, Consulting Engineers. Representatives from the company met with State Board of Health officials on August 5, 1964. At that time they reached an agreement in which the company was immediately to authorize final planning of new plant sewers and facilities for the collection and treatment of industrial wastes and to submit them to the department for approval within the next several weeks. These treatment facilities would be similar in general design to those recommended by the Clinton Bogert report. The effluent quality standards listed in the Bogert report would be adhered to as minimum requirements before the effluent was discharged into Berry's Creek and the existing waste-holding lagoon would be abandoned after completion and operation of the waste treatment facilities. This agreement was memorialized in a letter from the bureau to the company dated August 6, 1964.

By letter dated November 2, 1964 Wood Ridge reported to the Department of Health about its progress on the waste treatment facility. Wood Ridge promised that construction of a tile sewer and collecting sump for separation of process wastes would be completed by the end of November, after which further laboratory

work would be done on the effluent and final plans for the treatment plant could be completed by March 31, 1965. The department responded by seeking greater haste on the company's part and indicating the hope that an adequate design and construction of a treatment project would be completed within the next few months so that "the source of pollution to Berry's Creek may be finally abated." By January 25, 1965 the Department of Health had apparently not received any information about the laboratory studies which were to accompany final installation of the sewers and collecting sump and sought additional information about the progress of the project. Apparently the sewer and collecting sump were completed on January 15, 1965. Wood Ridge planned to have the laboratory studies complete by March, with the planned treatment facilities "on stream by July 1965." In June 1965, however, the health department had received no reports on the laboratory studies or the design of the waste treatment facilities. Even by March 31, 1966 no treatment plant had been designed, let alone completed, at the site.

By late 1969 or early 1970 the federal Environmental Protection Agency became involved in the company's waste problems. John Ciancia, Chief of the Industrial Waste Section of the Federal Water Quality Administration, visited the site and determined that it was discharging process waste containing mercury. On October 23, 1970 the company approved a capital expenditure for improved effluent treatment—a problem characterized by a company document as "currently at an emergency level." That document asserted that

> We are discharging mercury at a rate which we cannot measure precisely, but which has been estimated by the F.W.Q.A. [Federal Water Quality Administration] at 4.2 lbs./day (55 GPM total discharge, averaged over 24 hours, 7 PPM mercury content). The preliminary standard which the F.W.Q.A. appears to be accepting from other mercury users is a maximum of 0.5 lbs./day, which we definitely exceed. . . . Ventron has already suffered adverse publicity because of alleged mercury discharges, and we will certainly receive more if we do not institute controls approved by the F.W.Q.A. While the current furor over mercury pollution undoubtedly contains much exaggeration and misinformation, it is unquestionably a toxic substance, and as such we are under a moral obligation, as well as an impending legal one, to effectively control the mercury effluent from our processes.

From subsequent correspondence between the federal agency and Ventron (by then, 1971, owner of the processing plant), we deduce that the parties were attempting to work out the details of a new treatment process to reduce the amount of mercury admittedly being deposited into Berry's Creek. Ventron never succeeded in preventing mercury contaminated effluent from reaching Berry's Creek. As noted, the processing plant tract was sold to the Wolfs in 1974 and their development of the property caused additional pollution problems which resulted in the suit filed by the DEP.

[266 *N.J.Super.* at 311–317, 629 *A.*2d at 901–904.]

Several aspects of the documentary record are noteworthy. The first State Department of Health report in 1956 noted that samples of wastes in Berk's settling tanks contained virgin mercu-

ry as well as organic and inorganic mercury compounds, and that effluent from the settling tanks discharged into an open ditch and eventually into Berry's Creek. At that time, Department of Health engineers informed Berk officials that the effluent discharging from the plant into Berry's Creek was unacceptable because of the high suspended-solids content and a high biological-oxygen demand (B.O.D.). During a follow-up visit in 1958, a state engineer, responding to a Berk executive's account of efforts to expedite construction of a new settling tank, informed the executive that a settling tank would not itself reduce the B.O.D. to within acceptable limits, emphasizing that continued discharge of effluent into Berry's Creek could be allowed only if Berk implemented further treatment in accordance with plans approved by the State. Thus, Berk's executives were alerted to the risk that the high B.O.D. demand that characterized Berk's effluent threatened depletion of the oxygen content of Berry's Creek, which in turn would compromise the Creek's capacity to accommodate fish, plants, and other wildlife. Moreover, although the early Department of Health reports did not focus on the extent to which the solids in Berk's effluent included mercury, a March 1959 departmental memorandum reported a conversation with a Berk official indicating his awareness that whatever effluent treatment methodology was selected,

the removal of the mercurial compounds will be a necessity. These are mainly in suspension and a large proportion of them are already removed by sedimentation, but many particles are too fine to permit removal by this means. Work is to be undertaken to determine if they can be successfully removed by a flocculation process.

By early 1960, Berk and its successor, Wood Ridge, knew that the local sewerage authority would not process the company's effluent, and represented to the State that the company would construct its own treatment facility. As a temporary measure, the company was then discharging its untreated effluent into a lagoon that provided an additional two-days detention before the ultimate discharge into Berry's Creek. However, Wood Ridge took no action toward construction of a treatment facility until 1964, when it engaged a consulting engineering firm after state officials again

complained about the company's failure to have submitted plans for the proposed treatment facility. The consulting engineers' report recommended the general design of Wood Ridge's new treatment facilities, set forth minimum effluent-quality standards, and contemplated abandonment of the waste-holding lagoon. Although Department of Health officials agreed generally with the report's proposals, Wood Ridge failed to complete the necessary laboratory studies and never filed final plans for the waste-treatment facility with state officials.

As noted, by 1970 the enforcement responsibility had shifted to the Federal Environmental Protection Agency (EPA), and the regulatory focus was then directed at the company's discharge of mercury into Berry's Creek. Whatever the company's prior awareness of mercury discharges may have been, by October 1970, the company could not fail to acknowledge that mercury "is unquestionably a toxic substance, and as such we are under a moral obligation, as well as an impending legal one, to effectively control the mercury effluent from our processes." Subsequently, Wood Ridge did install waste-treatment facilities that diminished the volume of mercury-contaminated effluent. However, until the plant ceased operations in 1974, Wood Ridge was unable to reduce the daily volume of mercury discharged into Berry's Creek below the level considered to be tolerable by the EPA.

## II

### Issues of Insurance–Policy Interpretation

The Court is presented with a number of significant insurance-coverage issues. Cross-petitioners argue that we need not determine whether the property damage for which remediation was ordered in the *Ventron* litigation resulted from an "occurrence," because in their view environmental-remediation costs imposed at the instance of governmental-enforcement agencies do not constitute "damages" as that term is used in standard CGL policies. They also contend that those policies containing the standard pollution-exclusion clause afford no coverage to Morton and its

predecessors because the discharges of pollutants from the mercury-processing plant into Berry's Creek and the surrounding area were not "sudden and accidental." Morton argues that the record presents an issue of fact about whether the property damage requiring remediation was "intended or expected from the standpoint of the insured," asserting that the Chancery Division's grant of summary judgment on that issue was error. We also address the duty-to-defend questions raised by the Appellate Division's reversal of the judgment for Morton against General Accident for a portion of Morton's defense costs and counsel fees.

### A. *"As Damages"*

In their joint cross-petition for certification, several of the insurance company defendants (supported by *amicus* Insurance Environmental Litigation Association) argue that aside from the question whether the discharges of pollutants by Morton's predecessors constitute covered "accidents" or "occurrences" under the various policies, the expenditures compelled by the judgment in the *Ventron* litigation do not constitute "damages" for which indemnification is payable under those policies. The Chancery Division, relying on *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.*, 218 *N.J.Super.* 516, 525–30, 528 *A.*2d 76 (App.Div. 1987), held that the term "damages" encompassed the remediation expenses mandated in *Ventron*. The Appellate Division did not address the issue. Although some variation appears in the language of the policies, the typical provision, characterized by the Liberty Mutual CGL policy, *supra* at 11, 629 *A.*2d at 836, states:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay *as damages* because of * * * property damage to which this policy applies, caused by an occurrence * * *.

[Emphasis added.]

The insurers argue that the critical phrase "as damages" confines their duty of indemnity to judgments for traditional tort-liability money damages, and imposes no obligation to reimburse Morton for equitable remedies such as governmentally-mandated

response costs intended to remediate environmental harm. They note and rely on the observation by the trial court that

[t]he State sought and received an Order for the cleanup of the land now owned by plaintiff. Money damages were not awarded to anyone by Judge Lester.

They also contend that the Spill Act, the primary statutory enactment on which defendants' liability in the *Ventron* litigation was based, distinguishes between "cleanup and removal costs," defined in *N.J.S.A.* 58:10–23.11b(d), and "damages," citing *N.J.S.A.* 58:10–23.11g(a). The essence of the insurers' argument, however, is that the undefined phrase "as damages" unambiguously is understood in the context of insurance coverage to have a technical but settled meaning, and refers only to traditional third-party compensatory awards rather than equitable-type relief intended not to compensate claimants but to remediate environmental damage.

Morton, supported by *amici* State of New Jersey and New Jersey State League of Municipalities, argues that the policy term "as damages" encompasses the remediation costs imposed by the Ventron judgment. Morton preliminarily observes that the joint and several liability of the Ventron defendants was predicated both on the Spill Act and common-law nuisance principles, *Ventron, supra,* 94 *N.J.* at 493, 468 *A.*2d 150, asserting that at least the relief based on common-law principles is analogous to a traditional tort-law damages award. More generally, Morton argues that the undefined term "as damages" should not be construed technically but rather should be accorded its plain meaning in order to vindicate the objectively-reasonable expectations of insureds, who would assume that CGL policies would cover environmental-remediation costs as well as third-party liability claims.

In resolving those competing contentions, we are not required to write on a blank slate, numerous federal and state courts having preceded us in addressing the issue. Three Circuit Courts of Appeals, applying state law, have concluded that environmental-remediation costs are not covered damages under CGL policies. *See Gresham v. Commercial Union Ins. Co.,* 951 *F.*2d 872, 875

(8th Cir.1991) (Arkansas law); *Parker Solvents Co. v. Royal Ins. Cos. of America,* 950 *F.*2d 571 (8th Cir.1991) (Arkansas law); *A. Johnson & Co. v. Aetna Casualty & Sur. Co.,* 933 *F.*2d 66, 69 (1st Cir.1991) (Maine law); *Cincinnati Ins. Co. v. Milliken & Co.,* 857 *F.*2d 979, 981 (4th Cir.1988) (South Carolina law); *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* 842 *F.*2d 977, 985 (8th Cir.) (en banc) (Missouri law), *cert. denied,* 488 *U.S.* 821, 109 *S.Ct.* 66, 102 *L.Ed.*2d 43 (1988) *(NEPACCO); Maryland Casualty Co. v. Armco, Inc.,* 822 *F.*2d 1348, 1352 (4th Cir.1987) (Maryland law), *cert. denied,* 484 *U.S.* 1008, 108 ˙*S.Ct.* 703, 98 *L.Ed.*2d 654 (1988). A number of federal district courts have reached the same conclusion. *United States Fidelity & Guar. Co. v. Morrison Grain Co.,* 734 *F.Supp.* 437, 450 (D.Kan.1990) (Kansas law); *Verlan, Ltd. v. John L. Armitage & Co.,* 695 *F.Supp.* 950, 953–55 (N.D.Ill.1988) (Illinois law); *Hayes v. Maryland Casualty Co.,* 688 *F.Supp.* 1513, 1515 (N.D.Fla.1988) (Florida law); *Travelers Ins. Co. v. Ross Elec.,* 685 *F.Supp.* 742, 744–45 (W.D.Wash. 1988) (Washington law). The Supreme Judicial Court of Maine has reached the same result. *See Patrons Oxford Mutual Ins. Co. v. Marois,* 573 *A.*2d 16, 18–19 (1990). The rationale for the viewpoint that "damages" does not include equitable relief such as payment of environmental-response costs is expressed plainly by the Eighth Circuit in *NEPACCO, supra:*

> Viewed outside the insurance context, the term "damages" is ambiguous: it is reasonably open to different constructions. Webster's Third New International Dictionary 571 (1971) defines "damages" as "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for wrong or injury caused by a violation of a legal right." The dictionary definition does not distinguish between legal damages and equitable monetary relief. *E.g., New Castle County v. Hartford Accident & Indemnity Co.* [673 F.Supp. 1359], at 1366 [ (D.Del.1987) ]. Thus, from the viewpoint of the lay insured, the term "damages" could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses.
>
> In the insurance context, however, the term "damages" is not ambiguous, and the plain meaning of the term "damages" as used in the insurance context refers to legal damages and does not include equitable monetary relief. *See Maryland Casualty Co. v. Armco, Inc.,* 822 F.2d [1348] at 1352 [ (4th Cir.1987) ]. The CGL policies require Continental to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies caused by an occurrence." (Emphasis

added.) "'The obligation of the insurer to pay is limited to 'damages,' a word which
has an accepted technical meaning in law." [*Aetna Casualty & Surety Co. v.*]
*Hanna,* 224 *F.*2d [499] at 503 [ (5th Cir.1955) ]. Although not defined in the CGL
policies, "[t]he word 'damages' is not ambiguous in the insurance context. Black
letter insurance law holds that claims for equitable relief are not claims for
'damages' under liability insurance contracts."

[842 *F.*2d at 985–86 (quoting *Maryland Casualty Co. v. Armco, Inc.,* 643 *F.Supp.*
430, at 432 (D.Md.1986)).]

■ The clear weight of authority, however, among both federal
and state courts adopts the view that the undefined term "dam-
ages" in CGL policies should be accorded its plain, non-technical
meaning, thereby encompassing response costs imposed to remed-
iate environmental damage. *Aetna Casualty & Sur. Co. v. Pintlar
Corp.,* 948 *F.*2d 1507, 1513 (9th Cir.1991) (applying Idaho law);
*Gerrish Corp. v. Universal Underwriters Ins. Co.,* 947 *F.*2d 1023,
1030 (2d Cir.1991) (applying Vermont law), *cert. denied,* —— *U.S.*
——, 112 *S.Ct.* 2939, 119 *L.Ed.*2d 564 (1992); *Independent Petro-
chemical Corp. v. Aetna Casualty & Sur. Co.,* 944 *F.*2d 940, 947
(D.C.Cir.1991) (applying Missouri law), *cert. denied sub nom.
Certain Underwriters at Lloyds, London v. Independent Petro-
chemical Corp.,* —— *U.S.* ——, 112 *S.Ct.* 1777, 118 *L.Ed.*2d 435
(1992); *New Castle County v. Hartford Accident & Indem. Co.,*
933 *F.*2d 1162, 1184–91 (3d Cir.1991) (applying Delaware law), *on
remand,* 778 *F.Supp.* 812 (D.Del.1991), *rev'd on other grounds,* 970
*F.*2d 1267 (3d Cir.1992), *cert. denied,* —— *U.S.* ——, 113 *S.Ct.* 1846,
123 *L.Ed.*2d 470 (1993); *Avondale Indus., Inc. v. Travelers Indem.
Co.,* 887 *F.*2d 1200, 1207 (2d Cir.1989) (applying New York law),
*cert. denied,* 496 *U.S.* 906, 110 *S.Ct.* 2588, 110 *L.Ed.*2d 269 (1990);
*Township of Gloucester v. Maryland Casualty Co.,* 668 *F.Supp.*
394, 400 (D.N.J.1987) (applying New Jersey law); *AIU Ins. Co. v.
Superior Court,* 51 *Cal.*3d 807, 274 *Cal.Rptr.* 820, 834–45, 799 *P.*2d
1253, 1267–78 (1990); *Aerojet–General Corp. v. Superior Court,*
211 *Cal.App.*3d 216, 257 *Cal.Rptr.* 621, 628 (1989); *A.Y. McDonald
Indus. v. Insurance Co. of North America,* 475 *N.W.*2d 607, 615–
22 (Iowa 1991); *Hazen Paper Co. v. United States Fidelity &
Guar. Co.,* 407 *Mass.* 689, 555 *N.E.*2d 576, 582–84 (1990); *United
States Aviex Co. v. Travelers Ins. Co.,* 125 *Mich.App.* 579, 336

N.W.2d 838, 842–43 (1983); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 179–84 (Minn.1990); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.*, 326 N.C. 133, 388 S.E.2d 557, 565–69 (1990); *Boeing Co. v. Aetna Casualty & Sur. Co.*, 113 Wash.2d 869, 784 P.2d 507, 510–15 (1990); *Compass Ins. Co. v. Cravens, Dargan & Co.*, 748 P.2d 724, 729–30 (Wyo.1988).

In adopting the view that "damages" includes environmental remediation costs, the Washington Supreme Court observed:

> These cases have found that cleanup costs are essentially compensatory damages for injury to property, even though these costs may be characterized as seeking "equitable relief." Or put another way, "coverage does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder." In *United States Fidelity & Guar. Co.*, the court found that once property damage is found as a result of environmental contamination, cleanup costs should be recoverable as sums that the insured was liable to pay. According to an earlier case, *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 589–90, 336 N.W.2d 838 (1983), the environmental cleanup costs are covered because they are equivalent to "damages" under state law:
>
> > If the state were to sue in court to recover in traditional "damages", including the state's costs incurred in cleaning up the contamination, for the injury to the ground water, defendant's obligation to defend against the lawsuit and to pay damages would be clear. It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs. The damage to the natural resources is simply measured in the cost to restore the water to its original state.
>
> [*Boeing, supra*, 784 P.2d at 511–12 (citations omitted).]

The Third Circuit, applying Delaware law, reached the same conclusion:

> The competing lines of cases relied upon by CNA and the County demonstrate that resolution of this issue turns on whether the word "damages" should be given its legal, technical meaning or its plain, ordinary meaning. Given the precepts of Delaware law and the absence of a definition limiting the meaning of "damages" in CNA's policies, we think that to state the question is virtually to answer it. In our view, the ordinary, usual meaning of "damages," which we are bound to apply under Delaware law unless the policy clearly directs us to another meaning, does not convey the limitations suggested by CNA. In short, we believe that the Delaware Supreme Court would find the *Avondale–Boeing–Spangler* line of cases to be the better reasoned. We thus conclude that the term "damages," in the

context of a standard CGL policy, should be interpreted broadly to encompass response costs and other equitable relief.

[*New Castle, supra,* 933 *F*.2d at 1188.]

Although this Court declined to address the issue in *New Jersey Department of Environmental Protection v. Signo Trading International, Inc.,* 130 *N.J.* 51, 67, 612 *A*.2d 932 (1992), Justice O'Hern, dissenting on other grounds, concluded that "environmental-response costs are covered damages under a CGL policy." *Id.* at 74, 612 *A*.2d 932. We find his analysis of the issue to be thoroughly persuasive:

> "Damages" means money to most people. Money is what DEP wants from Springer. One United States District Court in New Jersey has perhaps stated it best: In assessing what an insured would reasonably expect from a CGL policy, it reasoned that "[t]he average person would not engage in a complex comparison of legal and equitable remedies in order to define * * * 'damages', but would conclude based on the plain meaning of words that the cleanup costs imposed on [the insured] * * * would constitute an obligation to pay damages." *American Motorists Ins. Co. v. Levelor Lorentzen, Inc.,* No. 88–1994, 1988 WL 112142 at 3 (D.N.J. Oct. 14, 1988); *see also Avondale Indus., Inc. v. Travelers Indemn. Co.,* 697 *F.Supp.* 1314, 1319 (S.D.N.Y.1988) ("The average businessman does not differentiate between 'damages' and 'restitution;' in either case, money comes from his pocket and goes to third parties. * * * The average businessman would consider himself covered for cleanup expenditures applicable to others' properties."), *aff'd,* 887 *F*.2d 1200 (2d Cir.1989).

[*Id.* at 75–76, 612 *A*.2d 932.]

We are fully in accord with the views expressed by Justice O'Hern in *Signo Trading* and adopted by the majority of federal and state courts that have addressed the issue. Accordingly, we hold that the environmental-response costs and remediation expenses imposed on Morton's predecessors in the *Ventron* litigation constitute sums that Morton will have to pay "as damages" because of property damage, within the meaning of the CGL policies at issue. Although the "owned-property" exclusion, which generally bars coverage for "property damage to property owned or occupied [by] or rented to the insured," is asserted as a defense by some insurers, we imply no view concerning the effect of that

exclusion on the coverage issues before us, that issue not having been raised, briefed, or argued by the parties.

### B. *The Pollution–Exclusion Clause*

We next address the arguments against coverage based on the so-called pollution-exclusion clause. Several insurers contend that irrespective of our conclusion about whether the property damage requiring remediation was caused by an "occurrence," no coverage exists under policies containing the standard pollution-exclusion clause, which, as noted above, *supra* at 11–12, 629 *A*.2d at 836 provides:

> This insurance does not apply * * * (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Although the record reveals that some of the excess carriers had issued policies with non-standard pollution-exclusion clauses, we confine our analysis to the standard clause, on which the extensive briefs of the parties and *amici* have also focused. To facilitate our discussion of the issues, we first summarize our holding with respect to the interpretation that we shall apply to the standard pollution-exclusion clause, and then set forth in detail the factual and legal foundation for our conclusion.

We overrule the Appellate Division's decision in *Broadwell, supra*, to the extent that it holds that the standard pollution-exclusion clause should be understood merely to impose the same conditions on coverage as are imposed by the definition of "occurrence," which focuses on whether the ultimate damage was expected or intended from the standpoint of the insured. 218 *N.J.Super.* 516, 534–36, 528 *A*.2d 76. As is evident from the text of the standard clause, the phrase "sudden and accidental" does not characterize or relate to the *damage* caused by pollution but instead narrowly limits the kind of "discharge, dispersal, release or escape" of pollutants for which coverage is provided. Although the word "sudden" is hardly susceptible of precise definition, and

is undefined in those CGL policies that include the standard pollution-exclusion clause, we are persuaded that "sudden" possesses a temporal element, generally connoting an event that begins abruptly or without prior notice or warning, but the duration of the event—whether it lasts an instant, a week, or a month—is not necessarily relevant to whether the inception of the event is sudden. The meaning of the term "accidental" being generally understood, we discern that the phrase "sudden and accidental" in the standard pollution-exclusion clause describes only those discharges, dispersals, releases, and escapes of pollutants that occur abruptly or unexpectedly and are unintended. If applied as written, although interpretative questions undoubtedly would require resolution, the clause sharply and dramatically would restrict the coverage that previously had been provided under CGL policies for property damage caused by accidental pollution, which included coverage for continuous or repeated exposure to conditions, provided that the property *damage*—not the discharge—was "neither expected nor intended from the standpoint of the insured." We are fully satisfied that if given literal effect, the standard clause's widespread inclusion in CGL policies would limit coverage for pollution damage to so great an extent that the industry's representation of the standard clause's effect, in its presentation to New Jersey and other state insurance regulatory agencies, would have been grossly misleading. Proffered to regulators merely as a clarification of existing coverage "so as to avoid any question of intent," and as a continuation of coverage for pollution-caused "injuries that result[ ] from an accident," the industry's understatement of the clause's actual effect on coverage for pollution damage is both apparent and unjustifiable. Although the insurers urge that we not consider the regulatory history of the standard clause without a fuller record, we are persuaded that a remand would be redundant, and that this record together with the reported cases that address the regulatory history and the abundant independent commentary on the subject affords an accurate and comprehensive basis for our determination.

■ The industry's presentation and characterization of the standard pollution-exclusion clause to state regulators constituted virtually the only opportunity for arms-length bargaining by interests adverse to the industry, insureds having virtually no choice at all but to purchase the industry-wide standard CGL policy. Accordingly, we deem appropriate construing the pollution-exclusion clause in a manner consistent with the objectively-reasonable expectations of the New Jersey and other state regulatory authorities, because only those regulatory authorities were presented with an opportunity to disapprove the clause. As presented, the regulatory authorities would not readily have understood that the pollution-exclusion clause eliminated *all* coverage for pollution-related claims except in cases of abrupt and accidental discharges. Rather than "clarify" the scope of coverage, the clause virtually eliminated pollution-caused property-damage coverage, without any suggestion by the industry that the change in coverage was so sweeping or that rates should be reduced. For those reasons, we decline to enforce the standard pollution-exclusion clause as written. To do so would contravene this State's public policy requiring regulatory approval of standard industry-wide policy forms to assure fairness in rates and in policy content, and would condone the industry's misrepresentation to regulators in New Jersey and other states concerning the effect of the clause.

To the extent that an interpretation of the pollution-exclusion clause less sweeping than that required by its literal terms was fairly inferable from the industry's explanatory statements to regulators, we perceive that regulators would reasonably have understood the effect of the clause to have denied coverage for the intentional discharge, dispersal, release, or escape of known pollutants, whether or not the eventual damage was intended or expected from the standpoint of the insured. The industry's presentation of the clause to regulators described it as a clarification of the "intended and expected" clause of the basic "occurrence" definition "so as to avoid any question of intent," and could fairly be understood as an attempt to override the issue whether damage was intended by excluding coverage for intentional dis-

charges of known pollutants. Accordingly, we construe and give effect to the standard pollution-exclusion clause only to the extent that it shall preclude coverage for pollution-caused property damage caused by an "occurrence" if the *insured* intentionally discharged, dispersed, released, or caused the escape of a known pollutant.

1. Adoption and Approval of the Standard Pollution–Exclusion Clause.

The background events that led the insurance industry to adopt the standard pollution-exclusion clause are well-documented and relatively uncontroverted. *See* Nancy Ballard and Peter Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion,* 75 *Cornell L.Rev.* 610, 622–27 (1990); Robert Chesler et al., *Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Waste Site Liability,* 18 *Rutgers L.J.* 9, 31–38 (1986); Richard Hunter, *The Pollution Exclusion in the Comprehensive General Liability Insurance Policy,* 1986 *U. of Ill.L.Rev.* 897, 903–06; Thomas Reiter et al., *The Pollution Exclusion Under Ohio Law: Staying the Course,* 59 *U.Cin.L.Rev.* 1165, 1187–1203 (1991); E. Joshua Rosenkranz, Note, *The Pollution Exclusion Through the Looking Glass,* 74 *Geo.L.J.* 1237, 1241–53 (1986). A number of courts have also reviewed the events leading to the adoption of the pollution-exclusion clause. *See New Castle County, supra,* 933 *F.*2d at 1196–98; *Broadwell, supra,* 218 *N.J.Super.* at 532–34, 528 *A.*2d 76; *Just v. Land Reclamation Ltd.,* 155 *Wis.*2d 737, 456 *N.W.*2d 570, 573–75 (1990).

As both the cases and commentators acknowledge, CGL policies prior to 1966 afforded liability coverage for bodily injury and property damage "caused by accident," the term "accident" being undefined in the standard policy. Courts generally construed the term "accident" to encompass ongoing events that inflicted injury over an extended period provided that the injury was unexpected and unintended from the insured's standpoint. *See, e.g., Anchor*

*Casualty Co. v. McCaleb,* 178 *F*.2d 322 (5th Cir.1949) (imposing coverage for damage to adjacent properties from oil flow over two-day period); *Employers Ins. Co. v. Rives,* 264 *Ala.* 310, 87 *So.*2d 653 (1955) (holding property damage from gradual leakage of gasoline into well covered as accident), *on remand,* 38 *Ala.App.* 411, 87 *So.*2d 646, *cert. denied,* 264 *Ala.* 696, 87 *So.*2d 658 (1956); *McGroarty v. Great Am. Ins. Co.,* 36 *N.Y.*2d 358, 368 *N.Y.S.*2d 172, 329 *N.E.*2d 172 (1975) (imposing liability for damage caused by excavation and construction on adjacent property over several months); Ballard & Manus, *supra,* 75 *Cornell L.Rev.* at 623–24; Reiter et al., *supra,* 59 *U.Cin.L.Rev.* at 1187–88; Rosenkranz, *supra,* 74 *Geo.L.J.* at 1241–46.

In 1966 the insurance industry revised its standard-form CGL policy to afford coverage based on an "occurrence," which the policy defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage that was neither expected nor intended from the standpoint of the insured." Ballard & Manus, *supra,* 75 *Cornell L.Rev.* at 624; Reiter et al., *supra,* 59 *U.Cin.L.Rev.* at 1190. (The 1973 version of the standard CGL policy promulgated by the ISO re-defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Robert Tyler, Jr. and Todd Wilcox, *Pollution Exclusion Clauses: Problems in Interpretation and Application Under the Comprehensive General Liability Policy,* 17 *Idaho L.Rev.* 497, 499 (1981)). The 1966 revision of the CGL policy was generally understood "to cover pollution liability that arose from gradual losses," Rosenkranz, *supra,* 74 *Geo.L.J.* at 1247, and was acknowledged as having been "intended to broaden coverage * * * by avoiding an implication that there was no coverage for a continuing condition as distinguished from a sudden event." Robert Keeton, *Basic Text on Insurance Law,* § 5.4c, at 300 (1971). Those courts that have attempted to trace the events leading to adoption of the pollution-exclusion clause confirm the uniform understanding of the broadened coverage afforded under

the 1966 revision of the CGL policy. *See, e.g., New Castle County, supra,* 933 *F.*2d at 1197 ("The standard, occurrence-based policy thus covered property damage resulting from gradual pollution. So long as the ultimate loss was neither expected nor intended, courts generally extended coverage to all pollution-related damage, even if it arose from the intentional discharge of pollutants."); *United States Fidelity & Guar. Co. v. Specialty Coatings Co.,* 180 *Ill.App.*3d 378, 129 *Ill.Dec.* 306, 312, 535 *N.E.*2d 1071, 1077 (Ct.) ("Prior to the insertion of the pollution-exclusion in the 1970s, 'occurrence-based' coverage embraced not only the usual accident, but also exposure to conditions which continued for an unmeasured period of time."), *appeal denied,* 127 *Ill.*2d 643, 136 *Ill.Dec.* 609, 545 *N.E.*2d 133 (1989); *see also* Chesler et al., *supra,* 18 *Rutgers L.J.* at 31 ("[T]he inclusion of 'injurious exposure to conditions' as part of the definition of accident indicated that injury resulting from a continuing process was covered under the policy."); Reiter et al., *supra,* 59 *U.Cin.L.Rev.* at 1191 ("Indeed, gradual pollution was a paradigm example of what *was* a covered 'occurrence,' a feature of the CGL policy that the insurance industry aggressively marketed and routinely emphasized.").

Foreseeing an impending increase in claims for environmentally-related losses, and cognizant of the broadened coverage for pollution damage provided by the occurrence-based, CGL policy, the insurance industry drafting organizations began in 1970 the process of drafting and securing regulatory approval for the standard pollution-exclusion clause. "The insurer's primary concern was that the occurrence-based policies, drafted before large scale industrial pollution attracted wide public attention, seemed tailor-made to extend coverage to most pollution situations." Rosenkranz, *supra,* 74 *Geo.L.J.* at 1251. Commentators attribute the insurance industry's increased concern about pollution claims to environmental catastrophes that occurred during the 1960s. "Pollution claims burst on the insurance scene following the Torrey Canyon disaster and the Santa Barbara off-shore drilling oil spills in 1969." Hourihan, *Insurance Coverage for Environmental Damage Claims,* 15 *Forum* 551, 533 (1980). Other commentators

observe that the insurance industry, concerned about public reaction to environmental pollution, desired to clarify and publicize its position that CGL policies did not indemnify knowing polluters. Reiter et al., *supra*, 59 *U.Cin.L.Rev.* at 1195–56. Consistent with that objective, the President of INA announced his company's intention to adopt the pollution-exclusion endorsement with these comments:

> INA will continue to cover pollution which results from an accidental discharge of effluents—the sort of thing that can occur when equipment breaks down.
>
> We will no longer insure the company which knowingly dumps its wastes. In our opinion, such repeated actions—especially in violation of specific laws—are not insurable exposures. Moreover, we are inclined to think that any attempt to provide such insurance might well be contrary to public policy. We at INA hope that our anti-pollution exclusion may help encourage many companies to take the first, crucial steps toward improving their manufacturing processes—the steps that will lead eventually to a cleaner, healthier and, we hope, happier life for all. [Charles K. Cox, *Liability Insurance in the Era of the Consumer*, Address Before the Annual Conference of the American Society of Insurance Management (Apr. 9, 1970), *quoted in* Robert S. Soderstrom, *The Role of Insurance in Environmental Litigation*, 11 *Forum* 762, 767 (1976).]

Whatever may have been the industry's motivation, the General Liability Governing Committee of the Insurance Rating Board (IRB) (successor to the National Bureau of Casualty Underwriters) authorized its drafting committee

> to consider the question and determine the propriety of an exclusion, having in mind that pollutant-caused injuries were envisioned to some extent in the adoption of the current "occurrence" basis of coverage, and some protection is afforded by way of the definition of this term.
>
> [Reiter et al., 59 *U.Cin.L.Rev.* at 1197 (footnote omitted).]

The end-product of the IRB's drafting effort was the standard pollution-exclusion clause, *supra* at 11, 629 *A*.2d at 836, which became known as exclusion "f" of the standard form CGL policy. According to one member of the drafting committee, the pollution-exclusion clause allowed the underwriters "to perform their traditional function as insurers of the unexpected event or happening and yet * * * [did] not allow an insured to seek protection from his liability insurers if he knowingly pollute[d]." Francis X. Bruton, *Historical Liability and Insurance Aspects of Pollution Claims, Proceedings of Insurance, Negligence and Compensation*

*Law Section, ABA,* 1971, at 311, *quoted in* Soderstrom, *supra,* 11 *Forum* at 768. Other commentators have expressed similar conclusions about the central purpose of the pollution-exclusion clause. *See, e.g.,* Soderstrom, *supra,* 11 *Forum* at 767 ("By the use of the pollution-exclusion endorsement * * * [c]overage for willful, intentional or expected violations was to be excluded."); S. Hollis M. Greenlaw, *The CGL Policy to the Pollution Exclusion Clause: Using the Drafting History to Raise the Interpretation Out of the Quagmire,* 23 *Colum.J.L. & Soc.Probs.* 233, 246 (1990) ("Yet although the language of the pollution-exclusion clause is ambiguous, intra industry statements made contemporaneously with the drafting of the clause and representations made by the industry to various state insurance commissioners * * * reveal that the industry clearly intended to preclude coverage of the reckless polluter as well as the *intentional* polluter."). The New York State legislature apparently shared that view of the pollution-exclusion clause's purpose, enacting in 1971 a statute requiring policies issued to commercial or industrial enterprises to include the standard form pollution-exclusion clause, *N.Y.Ins.Law* § 46(13)–(14) (McKinney 1972), and offering this explanation for its adoption:

> For example, a polluting corporation might continue to pollute the environment if it could buy protection from potential liability for only the small cost of an annual insurance premium, whereas, it might stop polluting, if it had to risk bearing itself the full penalty for violating the law.

> [*New York Legis.Ann.* 353–54 (1971).]

As a New York appellate court explained, "The conclusion thus becomes compelling that the pollution exclusion clause, mandated by statute, was intended to apply only to actual polluters." *Niagara County v. Utica Mut. Ins. Co.,* 80 *A.D.*2d 415, 439 *N.Y.S.*2d 538, 540 (1981).

After industry approval, the IRB and the Mutual Insurance Rating Bureau (MIRB) sought state regulatory approval to add the pollution-exclusion clause as an endorsement to standard CGL policies, apparently submitting to most if not all states in which

approval was sought a standard explanatory memorandum that read in part as follows:

> Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident * * *.
>
> [*Reprinted in* Ballard and Manus, *supra,* 75 *Cornell L.Rev.* at 625–26.]

As the record indicates, the identical explanatory memorandum was filed by the IRB with the New Jersey Department of Insurance in May 1970. The Attorney General's *amicus* brief observes that the industry's submission of the pollution-exclusion clause and its approval by the Department of Insurance were specifically required by New Jersey's statutory provisions regulating rates for insurance coverage, *N.J.S.A.* 17:29A–1 to –28, although no rate change was sought with respect to the pollution-exclusion clause. We take note of other provisions of the insurance statutes that require approval of commercial-insurance policy provisions in order to prevent the issuance of policy forms that are inequitable or misleading. *See N.J.S.A.* 17:29AA–11. We assume that most states had in effect comparable regulatory provisions that mandated the submission of the pollution-exclusion clause for state approval.

In considering the IRB's explanatory memorandum concerning the effect of the pollution-exclusion clause—which the record suggests was the only explanation offered to New Jersey insurance officials—we accord special significance to the process by which that clause gained approval in New Jersey and other states. Realistically, once the clause gained regulatory approval, it was uniformly adopted as an endorsement to the standard-form CGL policies that were issued to innumerable commercial enterprises and governmental agencies for more than a decade. The abundant case law called to our attention by counsel for all parties may be regarded merely as an illustrative sample of the virtually universal inclusion of the standard clause, or one of its derivatives, in CGL policies issued throughout the United States. Of course,

after regulatory approval the specific provisions of the pollution-exclusion clause ordinarily were not negotiable by purchasers of CGL policies. As some commentators observe, the typical commercial insured rarely sees the policy form until after the premium has been paid. Ballard and Manus, *supra*, 75 *Cornell L.Rev.* at 621; W. David Slawson, *Mass Contracts: Lawful Fraud in California*, 48 *S.Cal.L.Rev.* 1, 12 (1974). Accordingly, to the extent that the pollution-exclusion clause ever was subjected to arms-length evaluation by interests adverse to the insurance industry, that evaluation occurred only when the clause was submitted to and reviewed by state regulatory authorities.

In considering the accuracy of the IRB's explanatory memorandum, we note that the insurance companies in this litigation, and in general, assert the position that the pollution-exclusion clause precludes coverage for all pollution damage, whether or not intended, unless the *discharge* of pollutants was "sudden" (meaning abrupt) and "accidental," or a so-called "boom" event. That being the industry's understanding of the effect of the pollution-exclusion clause, the first two sentences of the explanatory memorandum to state regulators are, to say the least, paradigms of understatement:

> Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent.

The first sentence is simply untrue. As discussed, *supra* at 32–33, 629 *A.2d* at 849–850, the 1966 version of the CGL policy covered property damage from gradual pollution and imposed no restriction on the "suddenness" of the pollutant discharge. We repeat the Third Circuit's observation in *New Castle, supra:*

> The standard, occurrence-based policy thus covered property damage resulting from gradual pollution. So long as the ultimate loss was neither expected nor intended, courts generally extended coverage to all pollution-related damage, even if it arose from the intentional discharge of pollutants.

For that matter, the appendix filed by the Attorney General contains the MIRB's Explanatory Memorandum of Changes submitted to the New Jersey Department of Banking & Insurance in support of the 1966 revision of the CGL policy. That memorandum stated:

> Coverage has been broadened to an "occurrence" basis which is defined in the jacket. The definition reinforces the intent that the injury be fortuitous from the insured's standpoint and *by the addition of coverage for "injurious exposure to conditions" eliminates the connotation of suddenness previously intended as respects coverage on an "accident" basis.*

[Emphasis added.]

In the context of the generally-recognized broad coverage afforded by the pre-existing "occurrence" policies for property damage caused by pollution, the industry's statement that "such coverage is not provided in most cases under present policies" is not only astonishing but inaccurate and misleading as well. As is widely acknowledged, even by commentators sympathetic to the insurers' position, the industry's primary concern in 1970 was that the occurrence-based policies "seemed tailor made to extend coverage to most pollution situations." Rosenkranz, *supra*, 74 *Geo. L.J.* at 1251. *See supra* at 33–35, 629 *A.*2d at 849–850.

The second sentence is even more misleading than the first. It states that "[t]he above exclusion clarifies this situation so as to avoid any question of intent," undoubtedly referring back to the immediately preceding clause that reads "because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence." Undeniably, the pollution-exclusion clause does "avoid any question of intent" because the clause excludes *all* coverage for unintentional pollution damage except for that caused by sudden and accidental discharges. But to characterize so monumental a reduction in coverage as one that "clarifies this situation" simply is indefensible. Stated accurately, the pollution-exclusion clause, as construed today by the industry, eliminates *all* coverage for unintended pollution-caused damage

that the occurrence-based policy had provided, except for the unusual "boom-event" type case in which the *discharge* of the pollutants was both sudden—meaning abrupt—and accidental. To describe a reduction in coverage of that magnitude as a "clarification" not only is misleading, but comes perilously close to deception. Moreover, had the industry acknowledged the true scope of the proposed reduction in coverage, regulators would have been obligated to consider imposing a correlative reduction in rates.

The succeeding sentence of the explanatory memorandum continued to camouflage the literal effect of the pollution-exclusion clause: "Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident * * *." In asserting that coverage for pollution-caused injuries is "continued," the statement does not alert regulators to the critical change effected by the clause: under the occurrence-based policy, coverage was afforded if the *property damage* was accidental; under the pollution-exclusion clause, even if the property damage is accidental, no coverage is afforded unless the *discharge of pollutants* is both sudden and accidental. The memorandum utterly obscures that distinction, and the conclusion is virtually inescapable that the memorandum's lack of clarity was deliberate.

Supplemental explanations submitted by the IRB to state regulatory agencies were similarly lacking in candor. As noted by a Georgia federal court, the IRB informed the Georgia Insurance Department by letter of June 10, 1970, that

> "the impact of the [pollution exclusion clause] on the vast majority of risks would be no change. It is rather a situation of clarification * * *. Coverage for expected or intended pollution and contamination is not now present as it is excluded by the definition of occurrence. Coverage for accidental mishaps is continued [except for the risks described in the filing]."

> [*Claussen v. Aetna Casualty & Sur. Co.*, 676 *F.Supp.* 1571, 1573 (S.D.Ga.1987) (quoting letter from R. Stanley Smith, Manager of the Insurance Rating Board, to the Georgia Insurance Department, June 10, 1970), *question certified by* 865 *F*.2d 1217 (11th Cir.), *certified question answered by* 259 *Ga.* 333, 380 *S.E.*2d 686,

answer to certified question conformed to 888 F.2d 747 (11th Cir.1989), on remand, 754 F.Supp. 1576 (S.D.Ga.1990).]

That letter prompted the Court to observe:

> The Court does not wish to condone the conduct of the insurance industry that plaintiff has exposed. The statements made by the Insurance Rating Board to the Georgia Insurance Department, if not fraudulent, certainly were not straightforward. The Rating Board downplayed the substantial effect the pollution exclusion clause would have on existing coverage in an effort to obtain approval for the clause's insertion into insurance policies.
>
> [Ibid.]

Similarly, in the course of regulatory proceedings before the West Virginia Commissioner of Insurance, the MIRB submitted a supplemental memorandum to explain the purpose of the exclusion: "This endorsement is actually a clarification of the original intent, in that the definition of occurrence excludes damages that can be said to be expected or intended." George Pendygraft et al., *Who Pays for Environmental Damage: Recent Developments in CERCLA Liability and Insurance Coverage Litigation,* 21 *Ind.L.Rev.* 117, 154 (1988). In reliance on the industry's submissions, the West Virginia Insurance Commissioner approved the pollution-exclusion in a written order that stated in part:

> The said companies and rating organizations have represented to the Insurance Commissioner, orally and in writing, that the proposed exclusions * * * are merely clarifications of existing coverage as defined and limited in the definitions of the term "occurrence", contained in the respective policies to which said exclusions would be attached;
>
> (2) To the extent that said exclusions are mere clarifications of existing coverages, the Insurance Commissioner finds that there is no objection to the approval of such exclusions[.]
>
> [Reprinted in Joy Technologies v. Liberty Mut. Ins. Co., [187 W.Va. 742], 421 S.E.2d 493, 499 (1992).]

Insurance departments in at least two other states expressed concern over the industry's submission of the pollution-exclusion clause. In June 1970, the Kansas Commissioner of Insurance addressed several questions to the IRB. One question reflected the Commissioner's assumption that the current definition of occurrence provided coverage for property damage caused by pollution. He wrote: "It appears that the General–Automobile Liability policy now provides coverage for contamination and

pollution. Please confirm." The IRB's response to the Commissioner's inquiry was inaccurate and misleading. It tracked the language of the explanatory memorandum submitted to state regulators, and did not attempt to explain or to disclose the full intended impact of the pollution-exclusion clause:

> It is our opinion that coverage for pollution or contamination is not provided under the present General–Automobile Liability policy because the damages can be said to be expected or intended, and thus are excluded by the definition of occurrence. It should be noted that the proposed endorsements will definitely clarify the situation.

The Insurance Commissioner of Puerto Rico apparently disapproved the pollution-exclusion clause when it initially was filed, prompting a supplemental letter from the IRB to the Commissioner. The IRB's letter sheds no light whatsoever on the restriction of coverage that the industry intended to achieve through the pollution-exclusion clause:

> We certainly appreciate that where an insured acts in violation of the law, the policy does not provide coverage for the consequences of such acts. The exclusion is not aimed at taking care of such a situation. Rather, it is designed to clarify the policy as respects other situations where questions of intent might arise. Such questions usually arise when, with respect to a particular situation, the policy does not clearly spell out what is and is not covered in terms clearly understood by the insured or his representative. Relying solely upon the policy definition of occurrence which requires that the act causing damage must not be expected nor intended by the insured, might well cause dispute as to whether in fact the act was unexpected or unintended particularly in a fact situation involving a continuous course of action. This kind of situation is often very costly to both insureds and companies since many of them are brought into court to be resolved. All too often, the courts have been deciding such questions in favor of insureds, while strongly criticizing companies for not clearly spelling out intent in the policy. The courts are insisting that policies should clearly set forth intent. When, in the courts opinion, the policy does not, companies usually end up paying out large sums of money for damages resulting from situations wherein no coverage was ever intended and for which no premium was ever charged. Under such circumstances, we strongly believe that it is both necessary and desirable to clarify as many situations as possible so as to avoid any question of intent. This is precisely what our Contamination or Pollution Exclusion is designed to do.

As noted, the response to the Insurance Commissioner of Puerto Rico contains no disclosure about how the specific wording of the pollution-exclusion clause would operate to reduce substantially coverage that previously had been provided for pollution

occurring over a sustained period. The conclusion is inescapable that the IRB intentionally avoided any discussion that would illuminate the magnitude of the intended restriction in coverage.

Because of the regulatory history leading to approval by the various state regulatory authorities, a number of State Attorneys General, including the New Jersey Attorney General in the *amicus* brief filed with this Court, have urged that the pollution-exclusion clause be interpreted in a manner consistent with the industry's representations to regulatory authorities in 1970. *See, e.g.,* Brief of *Amici Curiae* State of Delaware and Commonwealth of Pennsylvania, *New Castle County, supra,* 933 *F.*2d 1162; Brief of *Amicus Curiae* Insurance Commissioner of West Virginia, *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.,* 182 *W.Va.* 580, 390 *S.E.*2d 562 (1990); Memorandum of *Amicus Curiae* State of Indiana, in Support of Plaintiff's Motion for Partial Summary Judgment, *Ulrich Chem., Inc. v. American States Ins. Co.,* 1990 WL 484974 (Ind.Cir.Ct.1990) (No. 73C 01–8901–CP ·016). Although the interests of states in insurance-coverage litigation are generally consistent with the interests of insureds, the assertion by several State Attorneys General of estoppel-type arguments, based on a generalized recognition that the industry's presentation of the pollution-exclusion clause to regulators was misleading, strongly suggests that the issue warrants careful and comprehensive consideration.

Responding to assertions that the IRB's representations to state regulators concerning the effect of the pollution-exclusion clause were misleading, *amicus curiae* Aetna Casualty & Surety Co. (Aetna) argues that "regulatory history" should not be confused with "drafting history." Referring to an affidavit submitted in the *New Castle* litigation by one of the drafters of the pollution-exclusion clause, Aetna contends that the intent of the drafters of the clause was to restrict pollution coverage to the classical "accident" or "boom" event, and to exclude coverage for gradual pollution. That argument was addressed directly in deposition testimony by Richard E. Stewart, Superintendent of the New

York State Department of Insurance from January 1967 to December 1970 and President of the National Association of Insurance Commissioners, 1970–71 (testifying in *J.T. Baker, Inc. v. Aetna Casualty & Surety Co.*, No. CV–4794–SSB (D.N.J.1990)):

"[T]he drafting documents, *the internal documents,* speak of sudden in its temporal sense, and as accomplishing a serious cutback in coverage. Granted. I am not questioning the accuracy of anything in Mr. Bruton's affidavit as to what was going on. *The filings with the states are completely inconsistent with that. And * * * do not disclose it, do not develop it, and in fact affirmatively maintain that we're just dealing with a clarification of the occurrence definition.*

*Now, to me, and I think to other insurance people, what goes in a state filing is of much greater probative power than what is in an internal and unreleased series of memoranda. And since the—the internal communications, the drafting history documents that use temporal were not communicated outside the company bureau world, either to insureds and brokers, but only the filing documents and something like the Aetna bulletins to the field were communicated, but the filing documents are the ones that really matter, and they to me, in terms of what [a] company should be held to, contain the version of this ambiguous term which the industry should be held to. It's as simple as that, and I think it's a very straightforward answer * * *.*"

[Deposition Testimony of Richard Stewart, *quoted in* Robert Sayler, *The Emperor's Newest Clothes, Revisionism and Retreat: The Insurer's Last Word on the Pollution Exclusion,* 5 *Mealey's Litig. Reps., Insurance* at 27, 46 (1991).]

## 2. Judicial Treatment of the Pollution–Exclusion Clause.

The abundance of federal- and state-court decisions addressing the pollution-exclusion clause confirms that an enormous outpouring of judicial energy already has been expended in attempting to fathom how this exclusion should be interpreted. Although categorizing the various judicial approaches may appear superficially to be helpful, caution is essential because the factual circumstances often diminish the significance of a court's ruling. A Florida federal judge made the point colorfully:

This court recognizes that there is a plethora of authority from jurisdictions throughout the United States which, depending on the facts presented and the allegations of the underlying complaints, go "both ways" on the issues presented today. The cases swim the reporters like fish in a lake. The Defendants would have this Court pull up its line with a trout on the hook, and argue that the lake is full of trout only, when in fact the water is full of bass, salmon and sunfish too.

[*Pepper's Steel & Alloys v. United States Fidelity & Guar. Co.,* 668 *F.Supp.* 1541, 1549–50 (S.D.Fla.1987).]

Nevertheless, the divergent judicial approaches to the issue inform our own evaluation concerning the manner in which the pollution-exclusion clause should be construed.

We first survey the New Jersey decisions. Next, we review the extensive federal and state case law that has construed "sudden" to have a temporal meaning or has concluded that coverage under the pollution-exclusion clause is not provided for discharges of pollutants over a sustained period. Finally, we consider the substantial number of federal and state decisions that construe "sudden" to have a non-temporal meaning or that determine "sudden and accidental" to be ambiguous and to be construed against the insurer.

### a. *New Jersey Case Law.*

The earliest New Jersey case to address the pollution-exclusion clause was *Lansco, Inc. v. Department of Environmental Protection,* 138 *N.J.Super.* 275, 350 *A.*2d 520 (Law Div.1975), *aff'd o.b.,* 145 *N.J.Super.* 433, 368 *A.*2d 363 (App.Div.1976), *certif. denied,* 73 *N.J.* 57, 372 *A.*2d 322 (1977), in which the insured sought declaratory relief to establish coverage under a CGL policy for the cost of cleaning up an oil spill. Apparently, vandals had opened the valves on oil storage tanks causing some 14,000 gallons of oil to leak from the tanks into the Hackensack River. The carrier resisted coverage for the cost of cleanup, relying on the pollution-exclusion clause. The Chancery Division held, however, that the term "sudden" meant "happening without previous notice or on very brief notice; unforeseen; unexpected; unprepared for," and that because the oil spill had been neither expected nor intended by Lansco, it qualified as a sudden and accidental discharge, thereby qualifying for coverage. 138 *N.J.Super.* at 282, 350 *A.*2d 520.

Seven years later, in *Jackson Township Municipal Utilities Authority v. Hartford Accident & Indemnity Co.,* 186 *N.J.Super.*

156, 451 A.2d 990 (Law Div.1982), a local utility authority instituted suit to compel its carriers to defend and indemnify it from claims asserted by residents that the Authority negligently operated its landfill, causing pollutants to seep into a nearby aquifer and contaminate the water supply. The carriers disclaimed coverage, citing the pollution-exclusion clause. The Law Division, relying on out-of-state cases, concluded that the clause was ambiguous and that it could be "interpreted as simply a restatement of the definition of "occurrence"—that is, that the policy will cover claims where the injury was "neither expected nor intended." *Id.* at 164, 451 A.2d 990. Observing that the clause intended to bar coverage for the knowing polluter, the court determined that the Authority "never expected or intended that the waste would seep into the aquifer resulting in damage and injury to others." *Ibid.* Accordingly, the court ordered the carriers to provide a defense, reserving decision on their duty to indemnify. *Id.* at 165–66, 451 A.2d 990. Similarly, in *CPS Chemical Co. v. Continental Insurance Co.*, 199 N.J.Super. 558, 489 A.2d 1265 (Law Div.1984), *rev'd on other grounds*, 203 N.J.Super. 15, 495 A.2d 886 (App.Div.1985), the plaintiff instituted suit to compel a defense to an action instituted by the City of Philadelphia, alleging that the plaintiff's waste hauler had removed hazardous waste from its premises and, without the plaintiff's knowledge, had dumped the waste without authorization in a Philadelphia garbage dump. The carriers disclaimed coverage, relying in part on the pollution-exclusion clause. The Law Division, citing *Jackson Township, supra,* 186 N.J.Super. at 164, 451 A.2d 990, observed that the clause had been construed simply as a restatement of the definition of "occurrence." *CPS Chemical, supra,* 199 N.J.Super. at 569, 489 A.2d 1265. Concluding that the clause was ambiguous, the court construed the terms "sudden and accidental" as including unexpected and unintended events, and ordered the carriers to provide a defense. *Ibid.*

By far the most widely-cited New Jersey decision is *Broadwell, supra,* 218 N.J.Super. 516, 528 A.2d 76, involving a claim for damages against a carrier that refused to indemnify the insured

for the costs of remediating a gasoline leak that was migrating into telephone-company cable vaults located underground on adjacent property. The carrier denied liability, contending that the pollution-exclusion clause restricted coverage to damage caused by an "unexpected and instantaneous catastrophe." *Id.* at 530, 528 *A.*2d 76. Tracing the history of the adoption of the clause, the Appellate Division observed that its purpose was to encourage industry to improve its manufacturing and disposal practices, imposing a bar to coverage for pollution damage resulting from "knowing" pollution of the environment. *Id.* at 533, 528 *A.*2d 76. The court determined that the coverage provided by the pollution-exclusion clause was intended to be coextensive with the coverage provided by the definition of occurrence, *ibid.,* observing that any ambiguity and confusion inherent in the drafting of the clause should be resolved against the insurer. *Id.* at 536, 528 *A.*2d 76. It construed the term "sudden" to mean unexpected and unintended, without resolving whether the focus of the exclusion clause was on the discharge of pollutants or the damage to the environment. *Id.* at 535, 528 *A.*2d 76. Because it concluded that the record presented a factual issue on whether Broadwell had expected or intended environmental damage, the court reversed the Law Division's grant of summary judgment.

 b. *Cases Holding That "Sudden" has a "Temporal" Meaning or, Alternatively, That Discharges of Pollutants Over a Sustained Period are not "Sudden."*

Our discussion of federal and out-of-state cases construing the pollution-exclusion clause is necessarily extensive, in view of the remarkable number of reported decisions within the last decade or so. In addition, we perceive that so significant a connection exists between the decisions and the factual context in which the issue is posed that we have supplemented our citation of authorities with brief summaries of both the holdings and the factual settings, in order that the apparent divergence in judicial treatment of the pollution-exclusion clause may be better understood.

A significant number of federal and state courts, without advert-
ing to the regulatory history or the background of the pollution-
exclusion clause, have held that the clause excludes coverage for
property damage resulting from the discharge of pollutants over a
sustained period, although in several such cases the polluting
activity was so flagrant that coverage might have been denied on
the basis that the damage was not unexpected or unintended.
Those courts bar coverage either on the basis that "sudden" has a
temporal connotation, meaning abrupt or instantaneous, or else
conclude simply that discharges of pollutants over an extended
period cannot be deemed "sudden and accidental," without defin-
ing precisely the limits of those terms. A number of federal
courts of appeal, applying state law, have adopted that approach.
See *Aetna Casualty & Sur. Co. v. General Dynamics Corp.*, 968
*F*.2d 707, 710–11 (8th Cir.1992) (holding that because "accidental"
means "unexpected," "sudden" would be redundant if not held to
mean abrupt, and hence damage caused by discharges over sever-
al months of 300,000 gallons of bilge water by insured's waste
hauler at city landfill and discharges of toxic wastes from trucks
and deteriorating tanks at haulers disposal site were barred from
coverage by pollution-exclusion clause); *Hartford Accident & In-
dem. Co. v. United States Fidelity & Guar. Co.*, 962 *F*.2d 1484,
1487–92 (1992) (holding that "sudden" has temporal element sug-
gesting immediacy, abruptness, and quickness, and barring cover-
age under pollution-exclusion clause for environmental damage
caused by regular, intentional discharges over fifteen years of
liquid wastes containing PCBs even though insured was unaware
that wastes included PCBs), *cert. denied sub nom. El Paso
Natural Gas Co. v. Hartford Accident & Indem. Co.*, —— U.S.
——, 113 *S.Ct.* 411, 121 *L.Ed.*2d 335 (1992); *Northern Ins. Co. v.
Aardvark Assocs.*, 942 *F*.2d 189, 193–95 (3d Cir.1991) (applying
Pennsylvania law, concluding that "sudden and accidental" de-
scribes unexpected discharges that are abrupt and last short time,
and barring coverage for property damage caused by waste haul-
er's discharges of hazardous waste at disposal sites over several
years); *Lumbermens Mut. Ins. Co. v. Belleville Indus., Inc.*, 938

F.2d 1423, 1425, 1427 (1st Cir.1991) (applying Massachusetts law, construing "sudden" to mean abrupt, and holding that where insured engaged in continuous, long-term discharge of known pollutants, coverage was not provided for isolated instances in which rainstorm and fire had caused specific discharges of pollutants), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 969, 117 *L.Ed.*2d 134 (1992); *A. Johnson & Co. v. Aetna Casualty & Sur. Co.,* 933 *F.*2d 66, 72–76 (1st Cir.1991) (applying Maine law, construing "sudden" to mean temporally abrupt, and holding that pollution-exclusion clause bars coverage for insured's share of cleanup cost at waste-disposal facility that received hazardous-waste shipments from insured and others over thirteen years; record demonstrated that contamination of disposal site and adjacent property had occurred over extended period and not because of "sudden and accidental" discharges); *Ogden Corp. v. Travelers Indem. Co.,* 924 *F.*2d 39, 42–43 (2d Cir.1991) (applying New York law, construing "sudden" to describe discharges occurring over short period of time, and holding pollution-exclusion clause bars carrier's obligation to defend or indemnify insured in underlying litigation alleging that insured had engaged in continuous discharge of pollutants over period of thirty-three years); *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.,* 905 *F.*2d 954, 956–58 (6th Cir.1990) (applying Michigan law, construing pollution-exclusion clause as barring coverage for continuous or ongoing occurrences of pollution, but reversing summary judgment for insurer and remanding for factual determination of whether polluting events had been accidental and short in duration); *EAD Metallurgical, Inc. v. Aetna Casualty & Sur. Co.,* 905 *F.*2d 8, 10–11 (2d Cir.1990) (holding that pollution-exclusion clause barred insurer's duty to provide coverage in underlying litigation that alleged insured willfully had discharged radioactive substances into environment over six-year period); *FL Aerospace v. Aetna Casualty & Sur. Co.,* 897 *F.*2d 214, 219–20 (6th Cir.) (determining that under Michigan law sudden and accidental event occurs quickly, without warning and unintentionally, and holding that pollution-exclusion clause barred insured's claim for reimbursement of assessed cost of cleanup of

industrial-waste site in absence of proof that damage had been caused by sudden and accidental discharges of hazardous waste), *cert. denied,* 498 *U.S.* 911, 111 *S.Ct.* 284, 112 *L.Ed.*2d 238 (1990); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 *F.*2d 31, 34–35 (6th Cir.1988) (applying Kentucky law to define "sudden" by reference to temporal element that includes immediate and unexpected, and holding that property damage caused by regular and continuing discharges of coal dust over seven to eight years for which Kentucky air-pollution authorities had issued series of citations did not qualify for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Great Lakes Container Corp. v. National Union Fire Ins.,* 727 *F.*2d 30, 33–34 (1st Cir.1984) (applying New Hampshire law and holding that regular and continuous discharge of hazardous waste in ordinary course of drum- and barrel-reconditioning business was neither "occurrence" nor sudden and accidental discharge of pollutants under CGL policy).

Numerous federal district court decisions reflect a similar approach to the interpretation of the pollution-exclusion clause. *See Anaconda Minerals Co. v. Stoller Chem. Inc.,* 773 *F.Supp.* 1498, 1505–06 (D.Utah 1991) (applying Utah law as defining "sudden" to mean abrupt or instantaneous, and holding property damage caused by intentional discharges of thousands of tons of flue dust containing hazardous materials and discharges of other hazardous waste stored in drums and above-ground tanks ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *United States Fidelity & Guar. Co. v. Morrison Grain Co., supra,* 734 *F.Supp.* at 446–49 (applying Kansas law to define "sudden" as combining elements of quickness and without warning, and holding that property damage caused by deteriorating drums containing chemicals and pesticides improperly stored at one site and improperly buried at second site ineligible for coverage under pollution-exclusion clause, notwithstanding insured's lack of subjective knowledge that management of enterprise operated as joint venture improperly had disposed of hazardous waste); *Ray Indus., Inc. v. Liberty Mut. Ins. Co.,* 728 *F.Supp.*

1310, 1319 (E.D.Mich.1989) (applying Michigan law as construing "sudden and accidental" exception not to apply when discharges occurred regularly or continuously in course of insured's business, and holding property damage caused in part by insured's regular and continuous practice over thirteen years of depositing contaminated barrels and drums containing hazardous waste in landfill ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause), *aff'd in part, rev'd in part,* 974 *F*.2d 754 (6th Cir.1992); *Federal Ins. Co. v. Susquehanna Broadcasting Co.,* 727 *F.Supp.* 169, 177 (M.D.Pa.1989) (applying Pennsylvania law as construing pollution-exclusion clause to bar coverage for all damage caused by gradual pollution irrespective of whether insured had knowledge or participated in discharges, and denying coverage to insured for property damage caused over several years by improper hazardous waste disposal practices engaged in by hauler hired by insured), *amended in part on other grounds,* 738 *F.Supp.* 896 (M.D.Pa.1990), *aff'd,* 928 *F*.2d 1131 (3d Cir.), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 86, 116 *L.Ed.*2d 58 (1991); *C.L. Hathaway Sons v. American Motorists Ins.,* 712 *F.Supp.* 265, 267–69 (D.Mass.1989) (applying Massachusetts law as construing "sudden" to have temporal aspect and holding that property damage caused by gradual escape of toluene from underground pipe at slow rate over lengthy period ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.,* 702 *F.Supp.* 1317, 1326 (E.D.Mich.1988) (applying Michigan law to construe "sudden" as meaning "brief, momentary or lasting only a short time" but without resolving coverage questions and ultimately concluding after trial that insurers not obligated to indemnify insured for cost of cleanup of property damage resulting from chemical contamination in view of finding that *damage* had been expected or intended from standpoint of insured, 750 *F.Supp.* 1340, 1350 (E.D.Mich. 1990)); *State of New York v. Amro Realty Corp.,* 697 *F.Supp.* 99, 110 (N.D.N.Y.1988) (applying New York law as defining "sudden" to mean happening without previous notice or on very brief notice, unforeseen, unexpected, unprepared for, and holding that property

damage caused by intentional discharges of chemical solvents into drains and septic systems by insured's lessee over twenty-year period ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause), *aff'd in part, rev'd in part,* 936 *F.*2d 1420 (2d Cir.1991); *United States Fidelity & Guar. Co. v. The Murray Ohio Mfg. Co.,* 693 *F.Supp.* 617, 620–22 (M.D.Tenn. 1988) (applying Tennessee law as defining "sudden" to have temporal meaning combining "unexpected" with "quick," and holding that property damage resulting from insured's delivery of hazardous waste over six-year period to hauler for disposal at hauler's site ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause), *aff'd* 875 *F.*2d 868 (6th Cir.1989); *Hayes v. Maryland Casualty Co.,* 688 *F.Supp.* 1513, 1515 (N.D.Fla.1988) (applying Florida law to construe pollution-exclusion clause to bar coverage for property damage caused by pollution extending over substantial period of time and holding property damage caused by intentional deposits on insured's property of filtration material from dry-cleaning fluid over extended period ineligible for coverage under pollution-exclusion clause whether or not insured had expected or intended damage to occur); *Borden, Inc. v. Affiliated FM Ins.,* 682 *F.Supp.* 927, 930 (S.D.Ohio 1987) (applying Ohio law as defining "sudden" to mean "happening without previous notice or with very brief notice" and holding property damage resulting from regular and intentional deposits of radioactive and hazardous wastes over six years, creating thirty-five-foot pile covering thirty-five to forty acres, ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause), *aff'd,* 865 *F.*2d 1267 (6th Cir.), *cert. denied,* 493 *U.S.* 817, 110 *S.Ct.* 68, 107 *L.Ed.*2d 35 (1989); *Centennial Ins. Co. v. Lumbermens Mut. Casualty Co.,* 677 *F.Supp.* 342, 348–49 (E.D.Pa.1987) (applying Pennsylvania law as defining "sudden" to exclude discharges occurring continuously or even sporadically over period of time and holding that property damage resulting from improper disposal by insured's hauler of waste shipments containing over 79,000 gallons of hazardous waste delivered to hauler over thirteen-month period ineligible for coverage

under "sudden and accidental" exception to pollution-exclusion clause); *American Motorists Ins. Co. v. General Host Corp.*, 667 *F.Supp.* 1423, 1428–31 (D.Kan.1987) (construing "sudden" to mean unexpected and happening on brief notice, and holding that property damage arising from pollution of aquifer caused by discharges of salt brine in course of regular operation of salt plant over seventy-five years ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *aff'd*, 946 *F.2d* 1482, *remanded after reh'g*, 946 *F.*2d 1489 (10th Cir.1991); *Fischer & Porter Co. v. Liberty Mutual Ins. Co.*, 656 *F.Supp.* 132, 140 (E.D.Pa.1986) (applying Pennsylvania law as defining "sudden" to mean abrupt, without warning, and holding that property damage including contamination of wells and aquifers resulting from continuous dumping of toxic chemicals into drains that discharged on ground ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause).

Some state courts have adopted a similar interpretation of the pollution-exclusion clause. *See Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 *Cal.App.*4th 715, 15 *Cal.Rptr.*2d 815, 841–42 (1993) (construing "sudden and accidental" as conveying sense of unexpected event that is abrupt or immediate but not requiring that polluting event necessarily terminate quickly or have brief duration); *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, No. 78293, 1993 WL 241520, at 5, —— *So.*2d ——, —— (Fla. July 1, 1993) [1] (construing "sudden and accidental" to be unambiguous and to include sense of immediacy or abruptness, and holding that pollution-exclusion clause barred coverage for property damage caused by discharges of oil at plant site in regular course of

---

[1] On July 1, 1993, the Florida Supreme Court, in a four-to-three decision, withdrew its prior opinion in this litigation, *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, No. 78293, 1992 WL 212008, at 4–8 (Fla. Sept. 3, 1992), in which the court had construed "sudden and accidental" to mean unexpected and unintended, had determined that the purpose of the pollution-exclusion clause was to bar coverage for knowing polluters, and held that the pollution-exclusion clause did not bar the insured's claim for coverage. The court's prior decision also had been rendered by a divided court, four-to-three.

business by company to which insured had sold used crankcase oil generated by insured's business); *International Minerals & Chem. Corp. v. Liberty Mut. Ins. Co.*, 168 *Ill.App.*3d 361, 119 *Ill.Dec.* 96, 106–08, 522 *N.E.*2d 758, 768–70 (1988) (construing "sudden" to mean "without or on brief notice, abruptly or hastily" and holding that property damage caused by insurer's activities in regular course of business including emptying used barrels of chemicals and toxic wastes on grounds of insured's premises ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Polaroid Corp. v. Travelers Indem. Co.*, 414 *Mass.* 747, 610 *N.E.*2d 912 (1993) (construing "sudden" to be without ambiguity and to have temporal meaning, observing that whether discharge of pollutants is "sudden and accidental" is determined from perspective of discharger rather than from perspective of insured, and holding insured's claims for indemnity for cost of remediating property damage caused by intentional discharges of pollutants by insured's waste processor ineligible for coverage under pollution-exclusion clause); *Liberty Mut. Ins. Co. v. SCA Servs., Inc.*, 412 *Mass.* 330, 588 *N.E.*2d 1346, 1349–50 (1992) (construing "sudden" as having temporal element suggesting abruptness and holding that property damage resulting from routine business activity over several months during which barrels containing hazardous waste had been emptied into open trenches or dumped into trenches and flattened with bulldozer ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc.*, 407 *Mass.* 675, 555 *N.E.*2d 568, 572 (1990) (deciding only legal issues certified by federal district court in *In re Acushnet River & New Bedford Harbor: Proceedings Re Alleged PCB Pollution*, 725 *F.Supp.* 1264 (D.Mass.1989), *answer conformed to* 938 *F.*2d 1423 (1st Cir.1991), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 969, 117 *L.Ed.*2d 134 (1992), and holding that in context of pollution-exclusion clause "sudden" is unambiguous, has temporal quality, and abruptness of commencement of pollutant's discharge is crucial element); *Upjohn Co. v. New Hampshire Ins. Co.*, 438 *Mich.* 197, 476 *N.W.*2d 392, 397–401 (1991) (concluding

that "sudden" is defined with "a temporal element that joins together conceptually the immediate and the unexpected," and holding that where tank-level measurements of storage tank with toxic by-product dropped from 475 gallons to 80 gallons on day 1700 gallons of by-product was added, and continued to show low-level readings over ensuing three weeks while 13,600 additional gallons of by-product were added, property damage caused by leakage of 12,000 to 18,000 gallons of toxic by-product was ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 *N.C.* 688, 340 *S.E.*2d 374, 382–83 (1986) (defining "sudden" as describing an abrupt or precipitant event, and holding that cleanup cost of contaminated groundwater resulting from insured's disposal over six-year period of solid wastes at landfill that leached into contaminated adjacent property ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Transamerica Ins. Co. v. Sunnes,* 77 *Or.App.* 136, 711 *P.*2d 212, 214 (1985) (holding property damage caused by intentional discharges in regular course of business of acid and caustic wastes into city sewer line ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause even if damage had been unintended), *cert. denied,* 301 *Or.* 76, 717 *P.*2d 631 (1986); *Technicon Elecs. Corp. v. American Home Assurance Co.,* 74 *N.Y.*2d 66, 544 *N.Y.S.*2d 531, 542 *N.E.*2d 1048, 1050–51 (1989) (holding property damage caused by intentional discharges of toxic wastes into waterway ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Lower Paxton Township v. United States Fidelity & Guar. Co.,* 383 *Pa.Super.* 558, 557 *A.*2d 393, 402–04 (concluding that although "sudden" can include element of "unexpectedness," its use in conjunction with "accidental" reflects additional element of abruptness and brevity, and holding that evidence that methane-gas discharges from Township's landfill, which had been detected and monitored for approximately eighteen months, had penetrated into basement of residence of plaintiff in underlying litigation insufficient to support jury verdict requiring insurer to

indemnify Township pursuant to "sudden and accidental" exception to pollution-exclusion clause), *appeal denied,* 523 *Pa.* 649, 567 *A.*2d 653 (1989); *Techalloy Co. v. Reliance Ins. Co.,* 338 *Pa.Super.* 1, 487 *A.*2d 820, 826–28 (1984) (holding that claim for personal injuries asserted against insured seeking damages for injuries caused by intentional dumping of toxic waste over twenty-five years ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause).

As noted, those decisions turn primarily on the literal language of the pollution-exclusion clause, and typically make no reference to its derivation or regulatory history. We infer from their factual context that many of those cases, particularly those in which the polluting activity was intentional or continued over a period of years, could have been decided on the basis that no covered "occurrence" had been proved because the eventual damage had been intended or expected. Because the underlying facts in many of those cases reflect irresponsible waste-disposal practices on the part of insureds, the determination denying coverage would probably have been unaffected even if "sudden" had been construed to mean unexpected rather than abrupt, the purposeful and routine characteristic of the discharges rather than the temporal quality of "sudden" being decisive in most instances.

 c. *Cases Holding that the Meaning of Sudden is "Unexpected" and not Necessarily Temporal or Concluding that "Sudden and Accidental" Exception is Ambiguous and to be Construed Against Insurer.*

In addition to the New Jersey lower court cases, *supra* at 44–46, 629 *A.*2d at 856–857, a significant number of federal and state courts have declined to construe "sudden" as necessarily conveying a temporal meaning akin to abrupt, or have determined that either the word "sudden" or the "sudden and accidental" exception to the pollution-exclusion clause is ambiguous and to be construed against the insurer. A common characteristic of those cases is that the conduct of the insureds is generally less culpable than

that reflected in cases construing "sudden" to have a temporal meaning, relatively few of these *insureds* having regularly engaged in willful or knowing pollution. To the extent that some cases conclude that the "sudden and accidental" exception to the pollution-exclusion clause is ambiguous, those courts have identified three alternative justifications for that conclusion: (1) the background and regulatory history of the pollution-exclusion clause, see *supra* at 31–43, 629 *A.*2d at 848–856; (2) the variations found in standard dictionary definitions of "sudden"; or (3) the antecedent judicial interpretation of the "sudden and accidental" clause as it had been used in so-called "boiler and machinery" policies. As background, we briefly elaborate on the latter two grounds advanced by some courts to support the conclusion that "sudden and accidental" is ambiguous.

Because the words "sudden" and "accidental" in the standard CGL policy are undefined, courts often resort to the general rule that the terms in an insurance policy should be interpreted in accordance with their plain and commonly-understood meaning. *Lansco, supra,* 138 *N.J.Super.* at 281–82, 350 *A.*2d 520. In *Hecla Mining Co. v. New Hampshire Insurance Co.,* 811 *P.*2d 1083 (1991), the Colorado Supreme Court turned to dictionary definitions to inform its interpretation of the word "sudden":

> [W]e find that a number of recognized dictionaries differ on the meaning of the term "sudden." Webster's Third New International Dictionary 2284 (1986) attaches a number of definitions to "sudden." Webster's first defines "sudden" as "happening without previous notice ... occurring unexpectedly ... not foreseen." Webster's then lists synonyms for "sudden" that include "prompt" and "immediate." Random House Dictionary of the English Language 1900 (2 ed. 1987) defines the word "sudden" in a temporal sense as "happening, coming, made, or done quickly." Black's Law Dictionary 1284 (5th ed. 1979) defines "sudden" as "[h]appening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for."

> * * * * * * * *

> Although "sudden" can reasonably be defined to mean abrupt or immediate, it can also reasonably be defined to mean unexpected and unintended. Since the term "sudden" is susceptible to more than one reasonable definition, the term is ambiguous, and we therefore construe the phrase "sudden and accidental" against the insurer to mean unexpected and unintended.

[*Id.* at 1091–92.]

Similarly, the Georgia Supreme Court's frequently-quoted analysis of the meaning of "sudden" also relies on dictionary meanings and usages to support its conclusion that the primary sense of "sudden" is "unexpected":

> The primary dictionary definition of the word is "happening without previous notice or with very brief notice; coming or occurring unexpectedly; not foreseen or prepared for." Webster's Third New International Dictionary, at 2284 (1986). *See also* Funk and Wagnalls Standard Dictionary, at 808 (1980); Black's Law Dictionary, at 1284 (1979). The definition of the word "sudden" as "abrupt" is also recognized in several dictionaries and is common in the vernacular. Perhaps, the secondary meaning is so common in the vernacular that it is, indeed, difficult to think of "sudden" without a temporal connotation: a sudden flash, a sudden burst of speed, a sudden bang. But, on reflection one realizes that, even in its popular usage, "sudden" does not usually describe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death. Even when used to describe the onset of an event, the word has an elastic temporal connotation that varies with expectations: Suddenly, it's spring. *See also,* Oxford English Dictionary, at 96 (1933) (giving usage examples dating back to 1340, e.g., "She heard a sudden step behind her"; and, "A sudden little river crossed my path As unexpected as a serpent comes.") Thus, it appears that "sudden" has more than one reasonable meaning. And, under the pertinent rule of construction the meaning favoring the insured must be applied, that is, "unexpected."
>
> [*Claussen v. Aetna Casualty & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686, 688 (1989) (footnote omitted).]

Other courts have noted the use and judicial construction of the phrase "sudden and accidental" in the standard boiler and machinery policy to support the view that "sudden" need not be construed as synonymous with abrupt. *See, e.g., CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.,* 962 F.2d 77, 93–94 (1st Cir.1992); *New Castle, supra,* 933 F.2d at 1197. They rely on the principle that "[t]he judicial construction placed upon particular words or phrases made prior to the issuance of a policy employing them will be presumed to have been the construction intended to be adopted by the parties." 2 G. Couch, *Couch on Insurance 2d* § 15:20, at 195–96 (M. Rhodes rev. 2d ed. 1984). More than a decade before drafting of the pollution-exclusion clause commenced, state courts had construed the phrase "sudden and accidental" in boiler-and-machinery policies.

In *New England Gas & Electric Ass'n v. Ocean Accident & Guarantee Corp.*, 330 *Mass.* 640, 116 *N.E.*2d 671 (1953), the defendant issued a machinery-and-boiler policy covering a turbine that drove a generator. The policy covered damages caused by an "accident," and defined that word as "a sudden and accidental breaking, deforming, burning out or rupturing of the Object or any part thereof, which immediately impairs the functions of the Object and necessitates repair or replacement before its functions can be restored * * *." *Id.* 116 *N.E.*2d at 675. While being operated, the turbine began to run roughly, and was shut down after about one and one-quarter hours; the cause of the rough operation was a crack in the turbine spindle. The Supreme Judicial Court of Massachusetts held the damage to be covered by the terms of the policy:

> If we lay to one side any idea of the rapidity or quickness in the actual cracking of the spindle and give the term sudden its primary meaning according to the lexicographers as a happening without previous notice or with very brief notice, or as something coming or occurring unexpectedly, unforeseen, or unprepared for, then the cracking of the spindle comes within this concept of the word, for it is plain from the report of the auditor that the mechanical defect which caused the cracking arose through no fault and even without the negligence of the insured and that the latter had no knowledge of the existence of the defect, much less any reason to anticipate that it would cause damage to the turbine. In fact, no one knew the cause of the damage until after the spindle had been replaced. The damage to the spindle could not be reasonably anticipated, and its occurrence was unexpected and unforeseen and consequently sudden in the ordinary meaning of the word.

[*Id.* 116 *N.E.*2d at 680–81.]

The boiler-and-machinery policy in *Anderson & Middleton Lumber Co. v. Lumbermen's Mutual Casualty Co.*, 53 *Wash.*2d 404, 333 *P.*2d 938 (1959), covered a large band saw. Loss was covered if "occasioned by an accident, defined as the sudden and accidental breaking of the bandsaw wheel, or any part thereof, into two or more separate parts while it was in use or connected for use." *Id.* 333 *P.*2d at 939. The saw began to vibrate more than usual, and was taken out of service two days later. When the wheel was removed, one of its spokes was found to be cracked all the way through and another was partially cracked. The insured's

expert testified that "there was a gradual cracking, extending through three quarters of the broken spoke, which must have occurred over a period of from one day to three weeks, but that the breaking of the last quarter was instantaneous." *Id.* at 940.

The trial court concluded that the break was "sudden" within the meaning of the policy, and the Supreme Court of Washington affirmed:

> The word "sudden" is defined in Funk & Wagnalls Standard Dictionary of the English Language as, "happening quickly and without warning; coming unexpectedly or in an instant; as, *sudden* death; *sudden* dismissal." In Webster's New International Dictionary (2d Ed.), it is defined: "Happening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for; as, a *sudden* shower, death, emergency, turn for the better, or attack of the enemy."

> The purpose of the contract was to insure the respondent against an accidental breakdown of the equipment covered by the policy. The word "sudden" was, of course, placed in the contract for a purpose. Is it more reasonable to assume that it was placed there to show an intent to exclude coverage of a break which did not happen instantaneously, or to exclude coverage of a break which was unforeseen and therefore unavoidable? It seems to us that the risk to the insurer would be the same, whether a break was instantaneous or began with a crack which developed over a period of time until the final cleavage occurred, as long as its progress was undetectable. On the other hand, the insured should not be permitted to proceed recklessly and hold the insurer liable for damage if it had been forewarned of a possible break and could have taken steps to forestall it or avoid an interruption of business resulting therefrom.

> \* \* \* There is no suggestion that the policy was not meant to cover breakage resulting from latent defects in the machinery or from fatigue. The cause is not, nor is the result, one which it is claimed is excluded. It is only contended that the result, in order to be within the coverage of the policy, must have happened instantaneously. *We do not so construe the word "sudden," when its primary meaning, in common usage, is not "instantaneous" but rather "unforeseen and unexpected."*

[*Id.* at 940–41 (last emphasis added).]

*See also Julius Hyman & Co. v. American Motorists Ins. Co.,* 136 *F.Supp.* 830, 832–33 (D.Colo.1955) (holding that leak in boiler pipe that occurred after gradual weakening of pipe over time had caused pipe to split at weakest point constituted sudden and accidental cracking of pipe under boiler-and-machinery policy); *City of Detroit Lakes v. Travelers Indem. Co.,* 201 *Minn.* 26, 275

*N.W.* 371, 372 (1937) (upholding jury verdict for insured and concluding that rupture of casting in insured's power-plant steam engine, although caused by conditions that developed gradually and slowly, was sudden and accidental within meaning of standard boiler-and-machinery policy). *But see Cornell Wood Prods. Co. v. Hartford Steam Boiler Inspection & Ins. Co.,* 62 *F.Supp.* 303, 305 (N.D.Ill.1945) (holding that damage to generator caused by submersion in water for sixty hours following three-day flood did not constitute sudden and accidental breaking of generator under standard boiler-and-machinery policy).

Perhaps the most significant aspect of the boiler-and-machinery policy cases lies in the Washington Supreme Court's observation that from the insurer's standpoint little if any justification existed for distinguishing between breaks in machinery that occurred instantaneously and those that resulted from gradual wear but were undetectable: "It seems to us that the risk to the insurer would be the same, whether a break was instantaneous or began with a crack which developed over a period of time until the final cleavage occurred, as long as its progress was undetectable." *Anderson & Middleton, supra,* 333 *P.*2d at 940. The court's analysis suggests that the absence of "suddenness" is a poor proxy for fault, that non-sudden events can be as blameless as "sudden" ones. An analogous view of the arbitrariness of conditioning pollution coverage on the suddenness, or abruptness, of the discharge of pollutants also may have informed those courts that have declined to accord "sudden" a temporal meaning in the context of the pollution-exclusion clause.

Those federal courts that have avoided a strict, temporal construction of "sudden and accidental" are often influenced significantly by their analysis of the applicable state law. *See CPC Int'l, supra,* 962 *F.*2d at 95–98 (applying New Jersey Law, predicting on basis of *New Castle, supra,* 933 *F.*2d 1162, that New Jersey Supreme Court would construe pollution-exclusion clause to be ambiguous and would follow holding in *Broadwell, supra,* 218 *N.J.Super.* 516, 528 *A.*2d 76, and remanding to district court to

determine whether property damage for which indemnity was sought had been intended or expected from standpoint of insured); *Broderick Inv. Co. v. Hartford Accident & Indemn. Co.*, 954 *F.*2d 601, 608 (10th Cir.) (applying Colorado law, determining that phrase "sudden and accidental" is ambiguous, construing "sudden and accidental" to mean unexpected and unintended, and holding that property damage resulting from insured's intentional discharge of toxic chemicals into storage ponds was ineligible for coverage under "sudden and accidental" exception to pollution-exclusion clause), *cert. denied*, —— *U.S.* ——, 113 *S.Ct.* 189, 121 *L.Ed.*2d 133 (1992); *New Castle, supra*, 933 *F.*2d at 1198–1203 (applying Delaware law, finding phrase "sudden and accidental" ambiguous, construing it to mean unexpected and unintended, but because phrase modifies discharge, holding that even if damage was unintended, coverage was unavailable unless *discharge* is unexpected and unintended; remanding to district court to determine whether discharge of leachate from county-operated landfill was unexpected and unintended), *on remand*, 778 *F.Supp.* 812, 819–20 (D.Del.1991) (holding that because leachate not known by county to be contaminant at time of discharge, discharge of leachate *as pollutant* was unexpected and unintended, invoking coverage under "sudden and accidental" exception), *rev'd*, 970 *F.*2d 1267, 1270–73 (3d Cir.1992) (holding that knowledge of contaminating quality of substance discharged is irrelevant and construing pollution-exclusion clause as imposing on insured risk of discharge of known contaminants); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 *F.*2d 1200, 1204–06 (2d Cir.1989) (applying New York law, and holding that insurer has duty to defend insured in shipbuilding and repairing enterprise that had sold chemical compounds and salvage oil to operator of twenty-year-old Louisiana dump site against litigation by private plaintiffs and State of Louisiana seeking damages from insured as "generator" of waste at dump site; duty to defend exists absent proof that discharges of pollutants at dump site were not sudden and accidental), *cert. denied*, 496 *U.S.* 906, 110 *S.Ct.* 2588, 110 *L.Ed.*2d 269 (1990); *Benedictine Sisters of St. Mary's Hosp. v. St. Paul Fire & Marine*

*Ins. Co.*, 815 *F*.2d 1209, 1210–12 (8th Cir.1987) (determining that whether claims against insured arose from "sudden accident" in non-standard pollution-exclusion clause depends on whether insured expected or intended damage at time of discharge, and holding that discharge of soot from hospital's boiler stack because of malfunction and on occasions subsequent to applications of soot removal compound constituted "sudden accidents involving pollutants," *id.* at 1212, requiring coverage under CGL policy); *MAPCO Alaska Petroleum, Inc. v. Central Nat'l Ins. Co.*, 795 *F.Supp.* 941, 945–47 (D.Alaska 1991) (concluding that sudden "in everyday English" has temporal meaning, is also understood to mean "happening without warning," and that focus of phrase "sudden and accidental" is on unexpected or unforeseen nature of event, *id.* at 945; holding that factual issue requiring trial was presented concerning whether discharge of benzene into groundwater from oil refinery operation characterized by innovative environmental-protection system had been unexpected and accidental); *Allstate Ins. Co. v. Quinn Constr. Co.*, 713 *F.Supp.* 35, 41 (D.Mass.1989) (applying Massachusetts law and holding property damage caused by undetected leak in two-inch pipe discharging five to six gallons of gasoline five times weekly over six-year period eligible for coverage under "sudden and accidental" exception to pollution-exclusion clause), *vacated*, 784 *F.Supp.* 927 (D.Mass.1990); *United States Fidelity & Guar. Co. v. Thomas Solvent Co.*, 683 *F.Supp.* 1139, 1155–61 (W.D.Mich.1988) (rejecting temporal definition of term "sudden," and holding insurers obligated to provide defense to insured in underlying action alleging sudden and accidental discharge of hazardous waste in insured's regular course of operations absent showing by insurers that allegations seek coverage for discharges barred by pollution-exclusion clause); *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guar. Co., supra*, 668 *F.Supp.* at 1548–50 (applying Florida law, construing "sudden and accidental" to mean unexpected and unintended, and holding that claims for damages based on contamination of aquifer resulting from intentional discharges of transformer oil that, unknown to insured, contained PCBs eligible for coverage under CGL policy

within "sudden and accidental" exception to pollution-exclusion clause); *United States v. Conservation Chem. Co.*, 653 *F.Supp.* 152, 160, 201–04 (W.D.Mo.1986) (finding pollution-exclusion clause ambiguous, and denying insurers' motions for summary judgment based on contention that pollution-exclusion clause eliminated duty to defend claims for property damage asserted against four generators who had delivered wastes to Missouri waste-disposal facility from which hazardous wastes had migrated); *National Grange Mut. Ins. Co. v. Continental Casualty Co.*, 650 *F.Supp.* 1404, 1409–12 (S.D.N.Y.1986) (applying New York law, finding pollution-exclusion clause to be ambiguous, "sudden" not limited to instantaneous happening and construing "sudden and accidental" to mean unexpected and unintended; denying insurer's summary-judgment motions based on pollution-exclusion clause to preclude coverage of insured for property damage caused by discharges of ash in operation of scrap-metal business in view of factual issue concerning insured's knowledge that ash constituted hazardous substance); *City of Northglenn v. Chevron U.S.A., Inc.*, 634 *F.Supp.* 217, 220–23 (D.Colo.1986) (applying Colorado law, finding pollution-exclusion clause to be ambiguous, triggering rule requiring clause to be construed against insurer and holding that whether property damage caused by gasoline leakage from underground line connecting gasoline tanks to dispensers was ineligible for coverage under CGL policy's pollution-exclusion clause could not be determined without factual record); *Payne v. United States Fidelity & Guar. Co.*, 625 *F.Supp.* 1189, 1191–93 (S.D.Fla.1985) (applying Florida law, construing "sudden and accidental" as meaning unexpected and unintended and holding that property damage allegedly caused by insured's refusal to grant EPA contractors access to site and failure to contain spread of PCBs discharged by metal-recovery business on adjacent property eligible for coverage under "sudden and accidental" exception to CGL policy pollution-exclusion clause).

A significant number of state courts have reached similar conclusions, construing "sudden" as non-temporal or discerning ambiguity in the phrase "sudden and accidental." *See Hecla Mining*

Co. v. New Hampshire Ins. Co., supra, 811 P.2d at 1090–92 (construing "sudden and accidental" to mean unexpected and unintended, and holding that claims for property damage resulting from surge of sedimentary sludge from mining tunnel attributable partly to insured's discharge of heavy metals in course of mining operations subject to insurer's duty to defend based on "sudden and accidental" exception to pollution-exclusion clause); Claussen, supra, 380 S.E.2d at 688–90 (construing "sudden" to mean unexpected, and holding that cost of remediating property damage caused by dumping over several years of industrial and chemical waste on fifty-two-acre site leased by insured to City of Jacksonville for use as landfill eligible for coverage notwithstanding CGL policy's pollution-exclusion clause); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 154 Ill.2d 90, 180 Ill.Dec. 691, 704–09, 607 N.E.2d 1204, 1217–22 (1992) (construing "sudden" to mean unexpected or unintended, and holding that claims for remediation of property damage involving contamination of Waukegan Harbor and Lake Michigan resulting from discharges over several years of hydraulic oil in ordinary course of insured's outboard-motor-manufacturing business, such oil having contained PCBs allegedly without insured's knowledge, subjected insurers to duty to defend under "sudden and accidental" exception to pollution-exclusion clause; resolution of insurer's duty to indemnify held subject to factual determinations after trial); United States Fidelity & Guar. Co. v. Specialty Coatings Co., supra, 129 Ill.Dec. at 310–13, 535 N.E.2d at 1075–78 (construing "sudden and accidental" non-temporally to mean unexpected and unintended, and holding that claims for remediation of property damage resulting from open dumping of hazardous wastes by hauler to whom insured and others had delivered industrial wastes for proper disposal covered by "sudden and accidental" exception to pollution-exclusion clause in insured's CGL policy); Reliance Ins. Co. v. Martin, 126 Ill.App.3d 94, 81 Ill.Dec. 587, 589–90, 467 N.E.2d 287, 289–90 (1984) (construing "sudden and accidental" non-temporally to mean unexpected and unintended, and holding that factual issues were presented concerning whether property damage and personal injuries caused by

carbon monoxide and soot regularly escaping from parking garage and entering adjacent condominium unit eligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Grinnell Mut. Reins. Co. v. Wasmuth*, 432 *N.W.*2d 495, 497–500 (Minn.Ct.App.1988) (construing "sudden" to mean unexpected, and holding that property damage resulting from improper installation of insulation causing gradual emission of formaldehyde in residential premises eligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Colonie Motors, Inc. v. Hartford Accident & Indem. Co.*, 145 *A.D.*2d 180, 538 *N.Y.S.*2d 630, 631–32 (1989) (concluding that phrase "sudden and accidental" should be construed not in abstract but in context of relevant facts, and holding property damage caused by crack in underground pipe of containment unit installed to prevent oil leakage and resulting in undetected and continuing discharge of waste oil that had contaminated groundwater eligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Niagara County v. Utica Mut. Ins. Co., supra*, 439 *N.Y.S.*2d at 540–42 (construing pollution-exclusion clause to apply only to "actual polluters," and holding that pollution-exclusion clause did not bar County's right to defense from CGL carrier in underlying "Love Canal" litigation alleging that County had failed to warn and safeguard citizens from dangers of toxic-waste discharges); *Farm Family Mut. Ins. Co. v. Bagley*, 64 *A.D.*2d 1014, 409 *N.Y.S.*2d 294, 295–96 (1978) (finding pollution-exclusion clause ambiguous, and holding that factual issue presented on whether property damage to crops caused by intentional spraying of chemicals on insured's fields that accidentally had been dispersed to adjacent farmland eligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Allstate Ins. Co. v. Klock Oil Co.*, 73 *A.D.*2d 486, 426 *N.Y.S.*2d 603, 604–05 (1980) (construing "sudden" non-temporally, and holding that property damage allegedly caused by undetected leak from insured's gasoline storage tank eligible for coverage under "sudden and accidental" exception to pollution-exclusion clause); *Kipin Indus., Inc. v. American Universal Ins. Co.*, 41 *Ohio App.*3d 228, 535 *N.E.*2d

334, 338 (1987) (finding pollution-exclusion clause ambiguous, relying on 1970 IRB submission to state regulators construing clause to bar coverage only when damage was intended or expected, and holding that claims for property damage resulting from continuous discharges of toxic chemicals by firm hired by insured's affiliate properly to dispose of hazardous waste subject to duty to defend under "sudden and accidental" exception to pollution-exclusion clause); *Buckeye Union Ins. Co. v. Liberty Solvents & Chems. Co.*, 17 *Ohio App.*3d 127, 477 *N.E.*2d 1227, 1233–35 (1984) (finding pollution-exclusion clause ambiguous, construing "sudden" non-temporally to mean unexpected, and holding that property damage caused by continuing course of irresponsible waste-disposal practices by operator of hazardous-waste facility hired by insured and others to dispose of hazardous waste subject to insurer's duty to defend under "sudden and accidental" exception to pollution-exclusion clause); *United Pacific Ins. Co. v. Van's Westlake Union, Inc.*, 34 *Wash.App.* 708, 664 *P.*2d 1262, 1266–67 (1983) (finding pollution-exclusion clause ambiguous, intended solely to bar coverage for active polluters, construing clause to bar coverage only for expected or intended events, and holding that claims for property damage caused by 80,000–gallon gasoline leak from small hole in underground pipe continuing over several months subject to CGL carrier's duty to defend under "sudden and accidental" exception to pollution-exclusion clause).

Two additional decisions that merit particular attention are *Joy Technologies, supra*, 421 *S.E.*2d at 499, and *Just, supra*, 456 *N.W.*2d at 573, in which both the Wisconsin and West Virginia Supreme Courts held that the pollution-exclusion clause bars coverage only for pollution-caused property damage that was intended or expected. In reaching that conclusion both courts relied significantly on the regulatory history of the pollution-exclusion clause, *Joy Technologies, supra*, 421 *S.E.*2d at 498–99, *Just, supra*, 456 *N.W.*2d at 574–75, as did the courts in *New Castle, supra*, 933 *F.*2d at 1196–98, *Claussen, supra*, 380 *S.E.*2d at 689, *Specialty Coatings, supra*, 129 *Ill.Dec.* at 311–13, 535 *N.E.*2d at 1076–78, *Broadwell, supra*, 218 *N.J.Super.* at 533–34, 528 *A.*2d

76, and *Kipin Indus., supra,* 535 *N.E.*2d at 338. Our extensive discussion earlier in this opinion concerning the regulatory history of the pollution-exclusion clause, *supra* at 31–43, 629 *A.*2d at 848–856, did not focus on the significant emphasis placed on that history by a number of courts that had found the meaning of the clause to be ambiguous in part because of the manner in which the industry had presented the clause to state regulatory agencies. In *Just, supra,* property owners adjacent to a landfill sought damages for personal injuries and property damage allegedly caused by the landfill's improper waste-disposal practices, and joined the landfill's CGL carrier as a third-party defendant. Relying on the pollution-exclusion clause, the lower courts held that that clause barred coverage for the claims. Reversing, the Wisconsin Supreme Court construed the clause as affording coverage essentially equivalent to that provided under the previously-issued "occurrence"-based policy, basing its holding substantially on the industry's representations to regulators in seeking approval of the pollution-exclusion clause:

> Contemporaneous representations by the insurance industry confirm that the drafting committee, in creating the exclusionary clause, clarified but did not reduce the scope of coverage. This expressed intent was also the interpretation relied upon by insurance regulators in approving the exclusionary clause when it was submitted for approval to various state insurance commissioners by representatives of the insurance industry.
>
> In May 1970, both insurance industry trade associations, (the Mutual Insurance Rating Bureau and the Insurance Rating Board,) submitted the standard pollution exclusion for approval by state regulatory authorities throughout the country.
>
> * * * * * * * *
>
> Some states questioned whether the purpose of the pollution exclusion was "limiting the coverage and not clarifying it." The Mutual Insurance Rating Bureau, which assisted in the draft of the exclusion endorsement, in a submission to the West Virginia Commissioner of Insurance, explained that the intent of the clause was to clarify " 'that the definition of occurrence excludes damages that can be said to be *expected or intended.*' " [quoting *Pendygraft, supra,* 21 *Ind.L.Rev.* at 154].
>
> * * * * * * * *
>
> Furthermore, documents presented by the Insurance Rating Board to the Georgia Insurance Commissioner when the pollution exclusion clause was first adopted suggest that the clause was intended to exclude only intentional polluters.

The Insurance Rating Board represented " 'the impact of the [pollution exclusion clause] on the vast majority of risks would be no change. It is rather a situation of clarification * * *. Coverage for expected or intended pollution and contamination is not now present as it is excluded by the definition of occurrence. Coverage for accidental mishaps is continued * * *.' " [quoting *Claussen, supra,* 676 *F.Supp.* at 1573].

[456 *N.W.*2d at 575.]

In *Joy Technologies, supra,* 421 *S.E.*2d 493, the insured had been engaged from 1968 to 1980 in the cleaning and rebuilding of motors used in mining machinery, requiring the regular and continuing disposal of oil contained in the motors. Although the record suggested that the insured's disposal practices "were commonly accepted in the industry at the time," *id.* at 498, Joy Technologies routinely disposed of PCB-contaminated oil in a storm drain and on its property, resulting in contamination of the insured's site and adjacent property. Joy sought coverage for remediation costs from Liberty Mutual, and the lower court held that the pollution-exclusion clause barred Joy's claim for indemnification. The West Virginia Supreme Court reversed, relying exclusively on the regulatory proceeding before the West Virginia Insurance Commissioner for its conclusion that the pollution-exclusion clause should be construed in a manner consistent with the industry's representations to state authorities indicating its intended effect:

Before the exclusion clause could be legally incorporated into the commercial general liability policy in West Virginia, it was necessary that Liberty Mutual obtain the approval of the West Virginia Insurance Commissioner. Before incorporating the exclusion clause, in accordance with West Virginia law, Liberty Mutual submitted the exclusion language to the West Virginia Insurance Commissioner for his approval.

The West Virginia Insurance Commissioner held hearings to consider the proposed exclusionary language. The record shows that, in conjunction with the submissions, the Insurance Rating Board and apparently also the Mutual Insurance Rating Board, acting on behalf of their members and subscribers, including Liberty Mutual, included with their submission of the proposed exclusion language an explanation [of the clause].

* * * * * * * *

This conclusion is further supported by an affidavit submitted by the former West Virginia Insurance Commissioner, who officially authorized the inclusion of the exclusion in West Virginia policies. That affidavit stated that "in preliminary submissions on the matter, the insurers represented that the proposed forms did not limit and were not intended to limit the coverage." The Commissioner also said in the affidavit that:

The insurers stated in pre-hearing submissions, at the hearing, and in post-hearing submissions that the proposed endorsement forms did not limit or narrow coverage and were not intended to do so. Based upon those representations, I concluded that the pollution endorsement forms did not narrow or limit coverage and, instead, were mere clarifications of existing coverage as defined and limited by the definition of the term "occurrence." Accordingly, I approved the endorsement forms IRB 335 and MIRB MB G008 submitted respectively by the Insurance Rating Board and the Mutual Insurance Rating Bureau.

\* \* \* \* \* \* \* \*

In this Court's view, it appears clear from the foregoing discussion that the 1966 commercial general liability insurance policies, as originally issued, covered gradual bodily injury and gradual property damage resulting over a period of time from exposure to the insured's waste disposal, as was suggested by Mr. Bean in the memorandum issued in conjunction with the drafting of the policies. They, however, as originally issued, excluded damage resulting from expected and intended pollution, as indicated by the Insurance Rating Board and the Mutual Insurance Rating Board in their 1970 filings with the West Virginia State Insurance Commissioner. Further, from the filings it is clear that in seeking approval of the exclusion provision, the insurance companies did not represent that they intended to exclude any risk which was not excluded in the original policies, but that they merely intended to clarify what had been excluded in the original policies. In approving the new policy language, the West Virginia Insurance Commissioner specifically stated that the companies and rating organizations had represented that the proposed exclusions were mere clarifications of existing coverage, and in approving the language the Insurance Commissioner approved it only "to the extent that said exclusions are mere clarifications of existing coverages."

This Court has recognized that where a definite meaning has been ascribed to language used in an insurance policy, that meaning should be given to the language by the courts. *Christopher v. United States Life Insurance Company in City of New York*, 145 *W.Va.* 707, 116 *S.E.*2d 864 (1960). In view of this, and in view of the fact that in the present case the insurance group representing Liberty Mutual unambiguously and officially represented to the West Virginia Insurance Commission that the exclusion in question did not alter coverage under the policies involved, coverage which included the injuries in the present case, this Court must conclude that the policies issued by Liberty Mutual covered pollution damage, even if it resulted over a period of time and was gradual, so long as it was not expected or intended.

[*Id.* at 498–500 (footnote omitted).]

3. *The Pollution–Exclusion Clause Bars Coverage Only for Intentional Discharges, Dispersals, Releases, or Escapes of Known Pollutants.*

We discern from the decisional law a tendency on the part of courts to construe "sudden" most restrictively in cases in which insureds have discharged known pollutants intentionally and on a regular and continuous basis over many years, *see, e.g., Ogden Corp. v. Travelers Indem. Co., supra,* 924 *F.*2d at 41–42, and in such circumstances courts rarely address the regulatory history of the pollution-exclusion clause. On the other hand, courts appear to be most inclined to consider non-temporal interpretations of "sudden and accidental" under circumstances in which the insured appears to be relatively blameless in respect of the discharge of pollutants, as in cases involving undetected leaks in underground gasoline lines, *see, e.g., Colonie Motors, supra,* 538 *N.Y.S.*2d at 632, cases in which the insured's waste disposal hauler improperly discharged hazardous waste, *see Buckeye Union Ins., supra,* 477 *N.E.*2d at 1233–35, or cases in which pollutants were discharged by entities unaffiliated with the insured but the insured was subjected to remediation responsibilities. *See Payne, supra,* 625 *F.Supp.* at 1191–93.

We also observe that the divergence of authority concerning whether "sudden" should be construed to mean abrupt, *see, e.g., Aardvark Assocs., supra,* 942 *F.*2d at 191–94, or unexpected, *see, e.g., New Castle County, supra,* 933 *F.*2d at 1192–99, is of but limited significance in most factual contexts, pollutant discharges generally occurring neither abruptly nor unexpectedly. Thus, in *New Castle County,* after the Third Circuit had construed "sudden" to mean unexpected, 933 *F.*2d at 1192–99, the district court concluded on remand that although County officials had known that leachate was being discharged from the landfill, the discharge had been unexpected because leachate was not then a known pollutant. 778 *F.Supp.* at 819–20. The Third Circuit reversed, holding that the discharge was not unexpected and that knowledge

of a pollutant's contaminating quality is irrelevant. 970 *F*.2d at 1270–73. In *Claussen, supra,* a case in which the City of Jacksonville, as tenant, apparently had engaged in a continuous course of discharging pollutants over several years, the Georgia Supreme Court construed "sudden" to mean unexpected. 380 *S.E.*2d at 690. On remand, the district court concluded that irrespective of whether Jacksonville's dumping of waste had been intentional, the question whether the discharge was unexpected should be determined from the standpoint of Claussen, the insured, holding that that question could not be determined without a trial. *Claussen, supra,* 754 *F.Supp.* at 1582. That interpretation of the literal language of the pollution-exclusion clause is problematic. Assuming that "sudden" is understood to mean unexpected, the literal language of the pollution-exclusion clause bars coverage unless the *discharge* was unexpected, the clause itself containing no suggestion that that determination should be made from the standpoint of the insured. A number of other courts that have construed "sudden" to mean unexpected appear to have done so on the assumption that whether the discharge was unexpected should be determined from the insured's perspective, not from the polluter's perspective, an assumption that derives no support from the plain language of the pollution-exclusion clause. *See, e.g., Specialty Coatings, supra,* 129 *Ill.Dec.* at 310–313, 535 *N.E.*2d at 1075–78; *Buckeye Union Ins. Co., supra,* 477 *N.E.*2d at 1233–35.

We are persuaded that construing "sudden" to mean unexpected will not materially expand the coverage afforded by the pollution-exclusion clause to a degree that approaches the breadth of coverage that had been afforded under the "occurrence"-based policy. Moreover, we are of the view that an interpretation of "sudden" that does not acknowledge its temporal quality is unfaithful to its core meaning, although that temporal connotation of "sudden" is not inconsistent with an application to events that begin, but not end, abruptly:

> This temporal element of "sudden" is so basic and capable of such broad application that it is often ignored or dismissed as inconsequential by parties and courts interpreting liability policies. Failure to understand this element had led

some insureds to argue that the commonly understood meaning of "sudden" has no temporal element. Courts that have not carefully considered the temporal nature of "sudden" have confused it with brevity and have asserted that an event which does not end quickly cannot be sudden. Certainly some "sudden" events do end quickly, due to the physical properties of the activity, such as a "sudden shot." * * * A sudden emergency is one which arises abruptly and unexpectedly. The duration of the emergency is irrelevant to the concept. A "sudden need" begins abruptly but need not end quickly. Similarly, a "sudden attack," "sudden fear," and "sudden resolve" may be of long or short duration. Compare a "sudden recognition" of an old schoolmate that may continue for one's lifetime with a "sudden explosion" lasting less than a minute, and a "sudden heat wave" which could last one day or several weeks. In common usage, a "sudden" event is one which begins abruptly or without previous notice, irrespective of whether the duration of that event is short or long.

[Ballard & Manus, *supra,* 75 *Cornell L.Rev.* at 615–17 (footnotes omitted).]

As noted, "sudden" events may begin abruptly, and continue undetected for a significant period. In addition, gradual deterioration of a pipeline or container is not necessarily inconsistent with a "sudden" discharge of pollutants. *See, e.g., Van's Westlake Union, supra,* 664 *P.*2d at 1266–67. In our view, however, a construction of "sudden" that acknowledges its temporal quality necessarily results in a severe restriction of coverage for pollution-caused property damage under the literal language of the pollution-exclusion clause.

That understanding of the pollution-exclusion clause's plain meaning reinforces our conclusion that the conflict over whether "sudden" means abrupt or unexpected misses the point, neither interpretation providing coverage for pollution-caused property damage that approaches the coverage afforded under the "occurrence"-based policy. The critical issue is whether the courts of this state should give effect to the literal meaning of an exclusionary clause that materially and dramatically reduces the coverage previously available for property damage caused by pollution, under circumstances in which the approval of the exclusionary clause by state regulatory authorities was induced by the insurance industry's representation that the clause merely "clarified" the scope of the prior coverage. Our resolution of that issue is heavily influenced by our recognition that this state's regulatory review of the pollution-exclusion clause was incidental to the

authority of the Commissioner of Insurance to determine the reasonableness of rates for insurance coverage. *N.J.S.A.* 17:29A–1 to –32. Concededly, no rate change was sought or required in connection with the IRB's submission of the pollution-exclusion clause. But had the IRB asserted then, as the insurers assert in this litigation, that the literal effect of the clause was to limit sharply the coverage for pollution-caused property damage to only those discharges of pollutants that occur *abruptly* and accidentally, the conclusion is inescapable that a significant rate reduction would have been required. The statute specifying the factors to be considered in determining rates includes "the loss experience of the insurer, past and prospective, including where pertinent, the conflagration and catastrophe hazards, if any * * * [and] all factors reasonably related to the kind of insurance involved * * *." *N.J.S.A.* 17:29A–11. The material and substantial reduction in coverage proposed by the pollution-exclusion clause, if disclosed to regulators in New Jersey and elsewhere, undoubtedly would have affected adversely the industry's rates for CGL coverage. Instead, because of the industry's failure, in its presentation to regulators, to acknowledge and emphasize the sharp reduction in coverage, insureds in New Jersey, and perhaps throughout the country, apparently have paid rates for CGL policies incorporating the pollution-exclusion clause comparable to those paid for the prior "occurrence"-based policies that afforded substantially greater coverage. We note that the New Jersey Department of Insurance's order approving the filing of the pollution-exclusion clause specifically recites that the approval is based on the determination "that the revised insuring forms will produce coverage at rates which are reasonable, adequate and not unfairly discriminatory in accordance with our statutory standards."

This Court is now asked to construe CGL policies containing the pollution-exclusion clause in a manner consistent with the clause's literal language, ignoring the industry's misleading presentation to state regulators over twenty years ago, and overlooking the apparent unfairness that such an interpretation would impose on policyholders who were charged rates that did not reflect the

radical diminution in coverage contemplated by the insurance industry. So to construe the pollution-exclusion clause would, in this Court's view, violate this State's strong public policy requiring regulation of the insurance business in the public interest, and would reward the industry for its misrepresentation and nondisclosure to state regulatory authorities.

In a non-regulatory context, this Court has long recognized the doctrine that an insurer who misrepresents the coverage of, or the exclusions from, an insurance contract to the insured's detriment may be estopped from denying coverage on a risk not covered by the policy. In *Harr v. Allstate Insurance Co.*, 54 *N.J.* 287, 255 *A.*2d 208 (1969), the insured sought recovery for water damage to business merchandise stored in the basement of his residence. Although neither the homeowner's policy nor the fire policy issued by Allstate covered the loss, the insured contended that Allstate was estopped from denying coverage under the fire policy because of representations by its agent reasonably relied on by the insured. The record disclosed that before leaving for a trip to Florida the insured had inquired of Allstate's representative, knowing that his homeowner's policy did not cover his business equipment, whether he could obtain coverage for such equipment. Allstate's representative informed Harr that Allstate "can cover you for $7500 and you are fully covered." Thereafter, Allstate issued Harr a fire insurance policy covering "merchandise in storage" but not affording coverage for damage caused by burst water pipes, a peril covered by Harr's homeowner's policy. While Harr was in Florida, a burst water pipe damaged the residence, personal property, and the stored equipment. Allstate's denial of coverage for the damaged equipment was sustained by the lower courts. Reversing, this Court held that

> where an insurer or its agent misrepresents, even though innocently, the coverage of an insurance contract, or the exclusions therefrom, to an insured before or at the inception of the contract, and the insured reasonably relies thereupon to his ultimate detriment, the insurer is estopped to deny coverage after a loss on a risk or from a peril actually not covered by the terms of the policy. The proposition is one of elementary and simple justice. By justifiably relying on the insurer's superior knowledge, the insured has been prevented from procuring the desired

coverage elsewhere. To reject this approach because a new contract is thereby made for the parties would be an unfortunate triumph of form over substance. The fact that the insurer has received no premium for the risk or peril as to which the loss ensued is no obstacle. Any additional premium due can be deducted from the amount of the loss. If the insurer is saddled with coverage it may not have intended or desired, it is of its own making, because of its responsibility for the acts and representations of its employees and agents.

[*Id.* at 306–07, 255 *A.*2d 208 (citations omitted).]

*See also Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 *Ariz.* 383, 682 *P.*2d 388, 400 (1984) (allowing insured to raise issue of estoppel to establish coverage contrary to limitations in standard-form policy when insurer's agent had represented that coverage was broader than that contained in policy); *Griggs v. Bertram,* 88 *N.J.* 347, 363–64, 443 *A.*2d 163 (1982) (insurer that failed to inform insured of potential disclaimer within reasonable time estopped from denying coverage on subsequent litigation against insured). *See generally* Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions,* 83 *Harv.L.Rev.* 961, 977–85 (1970) (supporting principle that policyholders can assert doctrine of estoppel to claim coverage contrary to policy provisions based on justifiable and detrimental reliance on insurer's representations).

Although we have not heretofore applied the estoppel doctrine in a regulatory context, its application to these circumstances is appropriate and compelling. A basic role of the Commissioner of Insurance is "to protect the interests of policy holders" and to assure that "insurance companies provide reasonable, equitable and fair treatment to the insuring public." *See In re N.J.A.C. 11:1–20,* 208 *N.J.Super.* 182, 189, 505 *A.*2d 177 (App.Div.1986). In misrepresenting the effect of the pollution-exclusion clause to the Department of Insurance, the IRB misled the state's insurance regulatory authority in its review of the clause, and avoided disapproval of the proposed endorsement as well as a reduction in rates. As a matter of equity and fairness, the insurance industry should be bound by the representations of the IRB, its designated

agent, in presenting the pollution-exclusion clause to state regulators.

An insurance doctrine closely related to "estoppel" holds that insurance contracts should be enforced to accord with the objectively-reasonable expectations of the insured even if the contract's technical provisions would not be found ambiguous by a sophisticated reader. For example, in *Gerhardt v. Continental Insurance Co.*, 48 *N.J.* 291, 225 *A.*2d 328 (1966), in determining that although the policy language was unambiguous, it was insufficiently clear to justify depriving the insured of her reasonable expectations of coverage, we observed:

> This quoted language was obscure on first reading to both counsel and the Court * * *.
>
> After the purpose of the quoted language is * * * explained it is understandable, but it seems highly unlikely that the ordinary insured would have so understood it on his or her own reading. As far as the plaintiff here was concerned, nowhere was there any straightforward and unconditional statement that the policy was not intended to protect the insured against a workmen's compensation claim by a residence employee injured at the insured's home.

[*Id.* at 299, 225 *A.*2d 328 (citation omitted).]

We explained the basis for the doctrine of "reasonable expectations" in *Sparks v. Saint Paul Insurance Co.*, 100 *N.J.* 325, 495 *A.*2d 406 (1985):

> The interpretation of insurance contracts to accord with the reasonable expectations of the insured, regardless of the existence of any ambiguity in the policy, constitutes judicial recognition of the unique nature of contracts of insurance. By traditional standards of contract law, the consent of both parties, based on an informed understanding of the terms and conditions of the contract, is rarely present in insurance contracts. W.D. Slawson, "Standard Form Contracts and Democratic Control of Lawmaking Power," 84 *Harv.L.Rev.* 529, 539–41 (1971); *R. Keeton, Insurance Law* 350–52 (1971). Because understanding is lacking, the consent necessary to sustain traditional contracts cannot be presumed to exist in most contracts of insurance. Such consent can be inferred only to the extent that the policy language conforms to public expectations and commercially reasonable standards. *See* W.D. Slawson, *supra*, 84 *Harv.L.Rev.* at 566; R. Keeton, *supra*, at 350–52. In instances in which the insurance contract is inconsistent with public expectations and commercially accepted standards, judicial regulation of insurance contracts is essential in order to prevent overreaching and injustice.

[*Id.* at 338, 495 *A*.2d 406.]

The observation that an insurance policy unambiguous to a sophisticated reader may be technically undecipherable to an average insured applies squarely to the standard CGL policy endorsed with the standard pollution-exclusion clause. A decade of litigation has illuminated the literal meaning of the clause and its relation to the definition of "occurrence," but that clarity of understanding was not prevalent in 1970 when the clause was submitted for regulatory approval. To the contrary, by virtue of the IRB "explanatory" memorandum, the common understanding of regulators undoubtedly was that the clause "clarified" but was consistent with the prior occurrence-based coverage. At most, the IRB's statement that the exclusion "clarifies this situation so as to avoid any question of intent" could have been understood to characterize the exclusion as denying coverage for the knowing discharge of pollutants, irrespective of whether damage had been expected or intended. As noted earlier, *supra* at 34–36, 629 *A*.2d at 850–851, the industry's public statements contemporaneous with the drafting and submission of the pollution-exclusion clause suggested that its overriding purpose was to deny coverage to intentional polluters. Because the pollution-exclusion clause, after regulatory approval, was added as an endorsement to most standard CGL policies, the typical commercial insured may have had little, if any, awareness that the terms of CGL coverage had been changed, much less any "objectively-reasonable expectation" of the scope of the new coverage, except to the extent of an assumption that unchanged premiums ordinarily would be consistent with a continuing level of coverage. To the extent that in the early 1970s informed "reasonable expectations" of the scope of coverage of the pollution-exclusion clause existed, such expectations were those of state regulators that had reviewed the IRB memorandum and understood that "coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident * * *." IRB explanatory memorandum, *supra* at 36, 629 *A*.2d at 851. We are fully persuaded that the "reasonable expectations" of the New Jersey insurance regulatory author-

ities should be imputed to those insureds to whom CGL policies with standard pollution-exclusion clauses were issued after the clause had been approved on the basis of the IRB memorandum.

Accordingly, we hold that notwithstanding the literal terms of the standard pollution-exclusion clause, that clause will be construed to provide coverage identical with that provided under the prior occurrence-based policy, except that the clause will be interpreted to preclude coverage in cases in which the *insured* intentionally discharges a known pollutant, irrespective of whether the resulting property damage was intended or expected. We expressly limit our holding concerning the limited effect of the pollution-exclusion clause to cases in which the insured or an agent specifically authorized to act for the insured intentionally discharges a known pollutant. We disapprove of holdings such as *Powers Chemco, Inc. v. Federal Insurance Co.*, 74 *N.Y.*2d 910, 549 *N.Y.S.*2d 650, 548 *N.E.*2d 1301 (1989), holding that claims for remediation costs against the insured based on property damage caused by intentional discharges of hazardous waste by the insured's predecessor in title were ineligible for coverage under the pollution-exclusion clause because the former landowner had intentionally discharged pollutants. In our view, so restrictive an application of the pollution-exclusion clause is inconsistent with the IRB's explanatory memorandum and with the industry's stated purpose of restricting the availability of pollution-caused damage coverage for those insureds who intentionally pollute the environment.

We add this additional observation. In declining to give effect to the literal provisions of the pollution-exclusion clause, we manifest no hostility to restrictive coverage provisions in standard-form insurance policies. Although intensively regulated, the insurance industry is entitled to reassess periodically the perils it chooses to insure and, subject to regulatory approval, to restrict coverage of risks in a manner consistent with its economic interests. Industry-wide determinations to restrict coverage of risks—particularly

those that affect the public interest, such as the risk of damage from environmental pollution—must be fully and unambiguously disclosed to regulators and the public. In the case of the pollution-exclusion clause, the importance of full disclosure in 1970 is illustrated by the events of the ensuing two decades. Under the Comprehensive Environmental Response, Compensation and Liability Act, 42 *U.S.C.A.* §§ 9601 to 9675 (CERCLA), and its state counterparts, joint and several liability for cleanup costs may be imposed retroactively and without regard to fault on a broad class of entities involved directly or indirectly in the process of disposal of hazardous substances. Estimated remediation costs range from 150 to 750 billion dollars. Reiter et al., *supra*, 59 *U.Cin.L.Rev.* at 1171. Industrial and governmental entities confronted with liability for remediation expenses, often based on hazardous-waste disposal that had occurred ten or twenty years earlier, invariably have turned to their CGL carriers for indemnification, only to be confronted with disclaimers of coverage in reliance on the pollution-exclusion clause.

Had the insurance industry candidly revealed the extent of the contraction in coverage intended by the pollution-exclusion clause, regulatory officials could have made informed judgments concerning the rate and coverage issues implicated by the clause, and both commercial and governmental insureds would have been aware that insurance coverage for environmental pollution would be sharply restricted. Conceivably, commercial and governmental insureds would have taken action, either directly or through intervention by state regulatory authorities, to encourage the industry to provide broader coverage for pollution damage, even at increased rates, perhaps avoiding the litigation explosion that the pollution-exclusion clause has precipitated. Had full disclosure been made, we would not hesitate to enforce the pollution-exclusion clause as written, resolving nuances inherent in the meaning of "sudden" on a case-by-case basis. Not only did the insurance industry fail to disclose the intended effect of this significant exclusionary clause, it knowingly misstated its intended effect in the industry's submission of the clause to state Depart-

ments of Insurance. Having profited from that nondisclosure by maintaining pre-existing rates for substantially-reduced coverage, the industry justly should be required to bear the burden of its omission by providing coverage at a level consistent with its representations to regulatory authorities.

## C. *Environmental Pollution and the Definition of "Occurrence."*

Irrespective of the effect of the "As Damages" language and the pollution-exclusion clause on Morton's claims for indemnification against its carriers, the ultimate issue remaining to be addressed is whether the events resulting in the property damage ordered to be remediated in the *Ventron* litigation constitute an "accident" or an "occurrence" as defined in the various CGL policies. As noted, *supra* at 10–11, 629 *A.*2d at 836, the primary CGL policy in effect until October 1964 provided coverage for "all sums which the Insured shall become legally obligated to pay * * * for damages because of injury to or destruction of property * * * caused by accident," the term "accident" being undefined. Effective in October 1964, the policy was amended by substituting "resulting from an occurrence" for the words "caused by accident," and defining "occurrence" as follows:

> The word "occurrence" as used in this endorsement means an unexpected event or happening which results in injury to or destruction of tangible property during the policy period, or a continuous or repeated exposure to conditions which result in injury to or destruction of tangible property during the policy period provided the insured did not intend or anticipate that injury to or destruction of property would result * * *.

Effective October 1966, and continuing throughout the period germane to this litigation, the primary CGL policies covering Morton's predecessors defined "occurrence" as follows:

> "Occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

In reviewing the trial court's grant of summary judgment to the insurers on the claims for indemnification, the Appellate Division separately addressed the pre–1966 policy that provided coverage for damages "caused by accident," and the post–1966 policies

providing coverage for damages "resulting from an occurrence." With respect to the "accident"-based policy, the Appellate Division correctly acknowledged that the trial court had focused improperly on the manner in which the injury had been caused and had erroneously concluded that the policy did not provide coverage for the unexpected result of a deliberate act. 266 *N.J.Super.* at 335, 629 *A.*2d at 914. Nevertheless, referring to the settled rule that a volitional act could qualify as an "accident" if the insured did not intend to cause harm or was not substantially certain that harm would occur, *see Broadwell, supra,* 218 *N.J.Super.* at 533, 528 *A.*2d 76, the Appellate Division concluded that the trial court's error had been harmless because the "evidence was overwhelming that plaintiff's predecessors must have been substantially certain that such harm would occur * * *." *Id.* 266 *N.J.Super.* at 336, 629 *A.*2d at 914.

In addressing the "occurrence"-based policies, the Appellate Division, without the benefit of this Court's decisions in *Voorhees v. Preferred Mutual Insurance Co.,* 128 *N.J.* 165, 607 *A.*2d 1255 (1992), and *SL Industries, Inc. v. American Motorists Insurance Co.,* 128 *N.J.* 188, 607 *A.*2d 1266 (1992), observed that the definition of "occurrence" was analogous to coverage provisions in other cases in which courts have determined that "the character of the act can be the basis of an inference that the insured intended the injury." 266 *N.J.Super.* at 330, 629 *A.*2d at 911. Relying primarily on *Atlantic Employers v. Tots & Toddlers,* 239 *N.J.Super.* 276, 282–83, 571 *A.*2d 300 (App.Div.1990), *certif. denied,* 122 *N.J.* 147, 584 *A.*2d 218 (1990), a child-sex-abuse case, the Appellate Division, referring to Morton's predecessors, concluded that "[t]he intentional character of the act is the basis for the inference that the insured either intended or was manifestly indifferent to the prospect of injury." 266 *N.J.Super.* at 330, 629 *A.*2d at 911. In reaching that conclusion, however, the Appellate Division noted that the "substantial environmental pollution over a long period" together with the knowledge by Morton's predecessors that "the substance being discharged * * * was toxic and harmful" ren-

dered unacceptable a conclusion that no harm had been expected. *Id.* at 332, 629 *A.*2d at 913.

Morton asserts that the Appellate Division's reliance on *Atlantic Employers, supra,* improperly equated the discharge of pollutants with child molestation as acts that could be deemed intentionally injurious as a matter of law. Morton contends that the Appellate Division improperly invoked an objective standard for determining whether harm had been intended or expected under the "occurrence"-based policies, ignoring the long-standing principle that coverage exists for the unintended results of intentional acts.

We recently had occasion to address issues analogous to those raised by Morton, although in a different context, in *Voorhees* and *SL Industries.* In *Voorhees, supra,* 128 *N.J.* 165, 607 *A.*2d 1255, the insured under a homeowner's policy was sued on the basis of statements she had made at a public meeting questioning the competency of her child's teacher, the plaintiff alleging that she had sustained various injuries including extreme emotional distress. The homeowner's policy provided coverage for liability arising from bodily injury caused by an "occurrence," defined as an "accident," but excluded coverage for liability caused intentionally. *Id.* at 171, 607 *A.*2d 1255. The carrier disclaimed coverage, asserting that the claims were based on the insured's intentional act and that the complaint sought recovery for "personal" rather than "bodily" injury. After the underlying case was settled, Voorhees sued her carrier for damages based on its disclaimer of coverage. A divided panel of the Appellate Division, reversing the trial court, determined that the carrier had a duty to defend irrespective of whether the claim was based on an "occurrence," construing the complaint as alleging causes of action that would be covered under the term "bodily injury." 246 *N.J.Super.* 564, 570–73, 588 *A.*2d 417.

On appeal, we noted that the duty-to-defend clause was not triggered "absent a potentially-coverable occurrence," 128 *N.J.* at 180, 607 *A.*2d 1255, observing that the insurer had limited its coverage to occurrences that were accidental in order to avoid

responsibility for covering insureds whose conduct was deliberately wrongful. *Ibid.* Writing for the Court, Justice Garibaldi adverted to the "careful balance" that we had struck between the public policy that "denies insurance indemnification for the civil consequences of wrong-doing," and the policy that favors compensation of victims through insurance proceeds "to the extent that that compensation will not condone and encourage intentionally-wrongful conduct." *Id.* at 181, 607 *A.*2d 1255. The competing considerations were set forth in *Burd v. Sussex Mutual Insurance Co.,* 56 *N.J.* 383, 267 *A.*2d 7 (1970):

> The exclusion of intentional injury from coverage stems from a fear that an individual might be encouraged to inflict injury intentionally if he was assured against the dollar consequences. Pulling the other way is the public interest that the victim be compensated, and the victim's rights being derivative from the insured's, the victim is aided by the narrowest view of the policy exclusion consistent with the purpose of not encouraging an intentional attack. And the insured, in his own right, is also entitled to the maximum protection consistent with the public purpose the exclusion is intended to serve.

[*Id.* at 398–99, 267 *A.*2d 7 (citations omitted).]

We held in *Voorhees* that "the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury," 128 *N.J.* at 183, 607 *A.*2d 1255, observing that an injury would be regarded as having been caused by an occurrence if the injury was unintended and unexpected, whether or not the act that caused the injury was intentional.

> That interpretation prevents those who intentionally cause harm from unjustly benefitting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing. It also accords with an insured's objectively-reasonable expectation of coverage for unintentionally-caused harm.

[*Ibid.*]

We also held in *Voorhees* that "[a]bsent exceptional circumstances that objectively establish the insured's intent to injure, we will look to the insured's subjective intent to determine intent to injure." *Id.* at 185, 607 *A.*2d 1255. We also noted that in cases

involving "particularly reprehensible" conduct, "the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure. That objective approach focuses on the likelihood that an injury will result from an actor's behavior rather than on the wrongdoer's subjective state of mind." *Id.* at 184, 607 *A.*2d 1255 (citing *Atlantic Employers, supra,* 239 *N.J.Super.* 276, 571 *A.*2d 300, the child-sex-abuse case, as example of factual setting in which intent to injure can be inferred on basis of objective conduct). Nevertheless, the Court concluded that the insured's statements, although intentional, had not been made under circumstances suggesting that injury to the teacher had been intended or expected, and also noting that the complaint's inclusion of an allegation of negligent infliction of emotional distress "presumes the absence of an intent to injure." *Id.* at 185, 607 *A.*2d 1255.

In *SL Industries, supra,* we confronted the related issue whether a general intent to cause injury that is inherent in a valid claim based on intentional fraud necessarily incorporates the intent to cause the specific resulting injury, emotional distress, or whether proof of a subjective intent to cause the specific injury is required. 128 *N.J.* at 209–13, 607 *A.*2d 1266. The suit underlying the coverage action in *SL Industries* included allegations by the insured's employee that he had been the victim of willful age discrimination in violation of the Age Discrimination in Employment Act, 29 *U.S.C.A.* §§ 621 to 634, as well as allegations of common-law fraud to the effect that he had been induced to retire by the false statement that his position was to be eliminated. After settling the underlying suit, the insured instituted a coverage action against its carrier, which the Law Division dismissed on summary judgment. Reversing, the Appellate Division held that although coverage was not provided for intended harm, coverage would be provided for the unforeseen results of intentional conduct, remanding the case to the Law Division to determine whether the employee's emotional distress had been intended or expected. 248 *N.J.Super.* 458, 465–67, 591 *A.*2d 677.

On appeal, this Court also addressed the issue whether emotional distress caused by a fraudulent misrepresentation constituted intentional harm, noting preliminarily that "the intent element in fraud, consisting of the intent to induce reliance, constitutes a subjective intent to injure." 128 *N.J.* at 209, 607 *A.*2d 1266. We then framed the issue before us as "whether *any* intent to injure will render the resulting injury intentional, whether the wrongdoer must intend the *specific* injury that results, or whether there is some middle ground between the two approaches." *Ibid.*

After evaluating alternative theories, we endorsed the view expressed in *Prudential Property & Casualty Insurance Co. v. Karlinski*, 251 *N.J.Super.* 457, 464, 598 *A.*2d 918 (App.Div.1991), which we summarized as follows:

> Assuming the wrongdoer subjectively intends or expects to cause some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the injury was "accidental" and coverage will be provided.
>
> [128 *N.J.* at 212, 607 *A.*2d 1266.]

Accordingly, we affirmed that aspect of the Appellate Division's judgment remanding the case to the Law Division to determine whether the employee's emotional distress had been a probable outcome of the insured's general intent to injure and, if not, whether the insured subjectively had intended to cause the employee's actual injuries. *Id.* at 212–13, 607 *A.*2d 1266.

In applying our holding in *Voorhees* to claims seeking coverage for property-damage caused by environmental pollution under occurrence-based CGL policies, we acknowledge the impracticality of adherence to the general rule that "we will look to the insured's subjective intent to determine intent to injure." *Voorhees, supra,* 128 *N.J.* at 185, 607 *A.*2d 1255. Although insureds may concede that pollutants—even known pollutants—had been intentionally discharged, those insureds are virtually certain to insist that the resultant harm was unintended and unexpected. Absent "smoking gun" testimony from a disgruntled employee, proof of subjec-

tive intent to cause environmental harm will rarely be available in coverage litigation.

We noted in *Voorhees* that an alternative to proof of subjective intent to injure existed in those cases in which the insured's "actions are particularly reprehensible, [so that] the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure." 128 *N.J.* at 184, 607 *A.*2d 1255. We cited *Atlantic Employers, supra,* 239 *N.J.Super.* 276, 571 *A.*2d 300, a case in which the insured was sued for sexual abuse of children in a day-care center, as illustrative of conduct that was so inherently injurious as to warrant the conclusion that intent to injure could be presumed. *Id.* at 185, 607 *A.*2d 1255. We are unpersuaded that environmental-pollution litigation should generally be included in that category of cases, typified by *Atlantic Employers,* in which reprehensible conduct justifies a presumption that injury was intended. As the numerous cases involving interpretation of the pollution-exclusion clause demonstrate, see *supra* at 43–69, 629 *A.*2d at 855–870, insureds held responsible for remediation of environmental pollution vary significantly in their degree of culpability for the harm caused by pollutant discharges. A general rule in environmental-pollution coverage litigation that would permit intent to injure to be presumed simply on the basis of a knowing discharge of pollutants would be unjustified.

■ Instead, we hold that in environmental-coverage litigation a case-by-case analysis is required in order to determine whether, in the context of all the available evidence, "exceptional circumstances [exist] that objectively establish the insured's intent to injure." *Voorhees, supra,* 128 *N.J.* at 185, 607 *A.*2d 1255. Those circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of

harm. Notwithstanding the Appellate Division's reliance on *Atlantic Employers* to support its holding, 266 *N.J.Super.* at 324–325, 330, 333, 629 *A.*2d at 908–909, 911, 913, we are satisfied that the Appellate Division's conclusion that environmental injury had been intended or expected rested essentially on its evaluation of the record before the trial court, and not on the assumption that environmental-pollution cases involving intentional discharges of pollutants inherently warrant a presumption that any resultant damage was intended.

## III

█ With respect to those policies that contain a standard pollution-exclusion clause, we hold that Morton is not entitled to indemnification for remediation costs imposed on its predecessors, because the conclusion is unavoidable that its predecessors had intentionally discharged known pollutants over a long and continuing period. As noted, we have determined to enforce the standard pollution-exclusion clause only to the extent of precluding coverage for an insured's intentional discharge of known pollutants. *Supra* at 70–80, 629 *A.*2d at 870–876. Putting to one side the question whether Morton's predecessors intended or expected environmental damage, that they had intentionally discharged known pollutants into Berry's Creek for approximately twenty years is incontrovertible. The very first Department of Health memorandum in April 1956 characterizes the effluent as containing organic and inorganic mercury compounds, with the effluent described as flowing into an open ditch that discharges into Berry's Creek. Department of Health engineers, during visits to the plant in 1958 and 1959, had informed Berk officials that the effluent discharging from the plant was "unacceptable by reason of a high suspended solids content and a high [Biological Oxygen Demand]." A Berk official had reported to a State engineer in 1958 that the Company unsuccessfully had attempted to persuade the Wood Ridge Sewer Authority to accept its wastes, and the engineer had admonished the official that no progress in alleviating the pollution problem

had been made in the previous two years. Reports in 1959 and 1960 by a consulting engineer retained by Berk revealed that the plant's effluent contained "deleterious characteristics." Reports of inspections by State engineers in February and December 1960 revealed that Berk's emissions continued to be untreated and "unacceptable" for discharge into Berry's Creek.

No action toward alleviating the "unacceptable" quality of its emissions was undertaken until 1964 when Berk agreed with Department of Health officials to implement treatment facilities recommended by a consulting engineer. Notwithstanding that agreement, the company apparently disregarded its commitment, taking no action to remediate the discharge of pollutants until early in 1970, after intervention by the federal Environmental Protection Agency. By then, company officials had acknowledged that the plant was discharging an average of 4.2 pounds of mercury per day.

The company's knowledge that its discharges into Berry's Creek contained unacceptable emissions, including organic and inorganic mercury compounds, combined with its evasive conduct from 1956 to 1970, involving a series of unfulfilled representations and undertakings to remediate the quality of its emissions, demonstrates beyond question that it regularly and intentionally had discharged known pollutants during that period. Accordingly, no coverage is provided under policies containing the standard pollution-exclusion clause. In view of our disposition concerning the question of a covered "occurrence," we need not and do not address coverage issues related to non-standard pollution-exclusion clauses.

Before addressing specifically the question whether the Appellate Division properly concluded that Morton's predecessors had intended or expected environmental harm as a matter of law, we consider preliminarily two arguments advanced by Morton to demonstrate the inappropriateness of summary judgment on that issue. First, Morton contends that because the trial court in the *Ventron* litigation concluded that the trial proofs had not estab-

lished that Berk and Wood Ridge had intended "to pollute the waters of the state," the trial court in the coverage proceeding could not properly conclude, without a trial, that an intention or expectation to cause environmental harm had been established as a matter of law. A related point pressed by Morton is that the Appellate Division misconceived its cross-motion for summary judgment as an acknowledgment that no triable issue of fact existed with respect to the intent or expectation of Morton's predecessors. Morton asserts that its cross-motion for summary judgment was based on its view that the determination of the *Ventron* trial court on the issue of intent to cause damage should have been binding in this proceeding.

We first note the context of the trial court's determination in *Ventron*. That court had previously ruled that Morton's predecessors were liable for remediation of damage to Berry's Creek under a statute originally enacted in 1937, *N.J.S.A.* 23:5–28, as well as under the New Jersey Water Quality Improvement Act of 1971, *N.J.S.A.* 58:10–23.2, –23.4. The court had also ruled that those statutory violations constituted proof that the defendants were liable for cleanup costs under a statutory-nuisance theory. Thereafter, addressing the issue of common-law nuisance, the *Ventron* trial court concluded that strict liability for nuisance should be imposed on the basis of the defendants' ultra-hazardous conduct in discharging pollutants from their plant. Before reaching that conclusion, the court considered but rejected the rationale that common-law nuisance could be premised on a finding that defendants had intended to cause environmental harm:

> What is meant is that the actor acts for the purpose of causing the invasion of another's interest or knows that such an invasion is resulting or is substantially likely to result from those acts. Surely Berk and WRCC intended to and volitionally did manufacture mercury compounds and dumped waste on the Velsicol property. However, the court cannot find that the acts were done with the intent to pollute the waters of the State with the knowledge that such an invasion was substantially certain to occur. No such knowledge or intent may be imputed to defendants under an intentional tort theory.

The *Ventron* court's observation is dictum, being unnecessary to its conclusion that common-law nuisance liability had been

established on the basis of the defendants' ultra-hazardous discharges of pollutants. Moreover, it focused on the question whether intentional injury sufficient to constitute a common-law nuisance had been proved, an inquiry different in substance and in context from whether injury is intended or expected under the provisions of an "occurrence"-based CGL policy. Finally, we are fully in accord with the Appellate Division's conclusion that under the collateral-estoppel doctrine the *Ventron* court's determination would not be binding in subsequent coverage litigation involving different parties. *See State v. Gonzalez*, 75 *N.J.* 181, 186, 380 *A.*2d 1128 (1977); *Mazilli v. Accident & Casualty Ins. Co.*, 26 *N.J.* 307, 313–14, 139 *A.*2d 741 (1958). The insurers participating in this coverage proceeding are clearly entitled to litigate for the first time the question whether a covered occurrence has been established. *See Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.*, 98 *N.J.* 18, 24–25, 483 *A.*2d 402 (1984); *Burd, supra*, 56 *N.J.* at 394, 267 *A.*2d 7.

Moreover, irrespective of the basis on which Morton filed its motion for summary judgment, the trial court in this proceeding had before it extensive documentary and testimonial evidence from the *Ventron* litigation sufficient to permit an informed determination about whether material factual issues remained in dispute. In view of our holding concerning the manner in which the insured's intent or expectation of injury must be proved in environmental-coverage litigation, *supra* at 85–86, 629 *A.*2d at 879–880, we find unpersuasive Morton's contentions that material factual issues remained in dispute or that a plenary trial was required to enhance further the record before the trial court.

■ Turning to the question whether environmental injury was intended or expected, we first observe that although the magnitude of the damage to Berry's Creek and the surrounding areas may exceed any intention or expectation attributable to Morton's predecessors, we do not consider that differences in harm relating to the severity of environmental damage give rise to a finding of

"improbability" of harm that invokes the need for evidence of subjective intent. *SL Industries, supra,* 128 *N.J.* at 212, 607 *A.*2d 1266. Whether Morton's predecessors anticipated that discharges of untreated effluent on the plant site and into Berry's Creek for more than forty years would cause environmental harm of the severity described in *Ventron, supra,* 94 *N.J.* at 481–82, 468 *A.*2d 150, hardly demonstrates that the extent of the injury was "improbable." The holding in *SL Industries* was based on the Appellate Division's ruling in *Karlinski, supra,* 251 *N.J.Super.* at 464, 598 *A.*2d 918, that in a coverage action arising from a fight between two young teenagers in which one sustained a broken hip, a factual issue of subjective intent was presented because of the inherent improbability that the skirmish would result in a hip fracture. *Id.* at 464–46, 598 *A.*2d 918. No such inherent "improbability" can be ascribed to the environmental damage attributable to Morton's predecessors.

In determining whether in the context of this record the trial court properly concluded, as a matter of law, that Morton's predecessors had intended or expected environmental injury, we focus on those factors that we previously have identified to be significant. *See supra* at 86, 629 *A.*2d at 880. Although the documentary evidence establishes that the discharges were detected as early as 1956 and continued until 1974, the record discloses that Berk commenced operating the mercury-processing plant in 1929. Thus, we can infer that the discharge of pollutants from the plant continued over a period of at least eighteen years and perhaps as long as forty-five years. The conclusion is inescapable that from as early as 1956, when the unacceptable quality of its emissions first was brought to Berk's attention, the discharges of pollutants thereafter occurred intentionally. The intentional nature of the discharges is confirmed by Berk's and Wood Ridge's continued evasion of and postponements of compliance with the repeated demands by Department of Health engineers that the discharges into Berry's Creek cease or that the company install adequate treatment facilities. Knowledge that its discharges were likely to cause harm was also inferable from the regular reports

submitted and demands for compliance asserted by state engineers, which Berk and Wood Ridge consistently ignored. Although we might fault the Department of Health officials for not acting on threats to institute enforcement proceedings, we cannot accurately assess whether effective statutory- or regulatory-enforcement mechanisms were then available. But the record fairly reflects a pattern of "stonewalling" on the part of Berk and Wood Ridge, characterized by promises of compliance that consistently were unfulfilled.

With respect to the extent of Berk's knowledge concerning the hazards presented by its untreated effluent, Berk was informed in 1956 that its effluent included organic- and inorganic-mercury compounds. A 1959 Department of Health memorandum reflected awareness by Berk officials that "the removal of the mercurial compounds will be a necessity." Berk officials were regularly informed, both by state engineers and by reports submitted by their own consultants, that its effluent was unacceptable for discharge into Berry's Creek because of its high suspended solids content and its high biological oxygen demand, characteristics that almost certainly conveyed to Berk's engineers the risk of depletion of the oxygen content of Berry's Creek, which would affect the Creek's capacity to accommodate wildlife. Hence, Berk's subjective knowledge that environmental harm was an inevitable result of its discharges was fairly inferable as early as the mid–1950s.

In February 1964, State officials intensified their efforts to compel Wood Ridge to install treatment facilities, noting in correspondence that one year had elapsed since the company had represented that it had retained consulting engineers to resolve its pollution problem. In response, Wood Ridge forwarded to Department of Health officials a report concerning proposed industrial-waste-treatment facilities. Based on that report, State officials reached agreement with Wood Ridge in August 1964 that the company would proceed with final plans for construction of treatment facilities consistent with those recommended by its consult-

ing engineers and would submit those plans for approval by the Department of Health. Although further correspondence ensued, Wood Ridge failed to comply with its undertaking to submit plans for a treatment facility to State officials. The record reveals that almost two years after its agreement with State officials to proceed with final plans for a treatment facility, Wood Ridge and its consulting engineers had not determined the most suitable method for treating Wood Ridge's waste. A letter from Edward R. Grich, Inc., dated March 31, 1966, to Wood Ridge's Vice President, states in part:

Numerous surveys of the characteristics of the waste waters resulting from the production of these chemicals have revealed the presence of *deleterious conditions in terms of suitability for stream discharge.* These include adverse ph intensity level (decidedly acidic or decidedly alkaline); high concentrations of alkalinity or acidity; high level of turbidity and color; excessive solids concentrations; high concentrations of chorides, sulfates and all forms of nitrogen; the decided presence of interfering substances in the determination of chemical oxygen demand and B.O.D., and the presence of formaldahyde and a chemical odor.

Many varied methods of treatment, designed to eliminate the deleterious conditions noted, have been investigated. In general, the methods employed were of a physical and/or chemical nature since the raw waste, as produced, would not be amenable to biological treatment methods.

The treatment processes employed included neutralization, settling, chemical flocculation, filtration, aeration and activated carbon absorption in varied combinations and orders of usage.

 * * * * * * * *

Additional studies are anticipated that may include further activated carbon studies.

[Emphasis added.]

The inescapable inference, based on the correspondence between Wood Ridge and State officials, and on the reports of its own engineers, is that Wood Ridge was fully cognizant that its effluent was unsuitable for stream discharge and that environmental damage inevitably would occur if its untreated effluent continued to flow into Berry Creek.

By 1970, Wood Ridge's knowledge that environmental harm was occurring and would continue to occur was beyond question, as evidenced by an inter-company memorandum approving an expen-

diture for improved effluent treatment. That document acknowledged that

> [w]e are discharging mercury at a rate which we cannot measure precisely, but which has been estimated by the F.W.Q.A. [Federal Water Quality Administration] at 4.2 lbs./day (55 GPM total discharge, averaged over 24 hours, 7 PPM mercury content). * * * While the current furor over mercury pollution undoubtedly contains much exaggeration and misinformation, it is unquestionably a toxic substance, and as such we are under a moral obligation, as well as an impending legal one, to effectively control the mercury effluent from our processes.

Little insight into the issue before us is gained from comparison with analogous cases, because specific facts and circumstances inevitably determine whether courts conclude that proof of an occurrence has been established. Many courts have concluded under comparable circumstances that continued discharges of pollutants over a prolonged period, combined with knowledge of the pollutants' deleterious qualities, is sufficient to establish an intention or expectation that environmental damage will occur. *See Fireman's Fund Ins. Cos., supra,* 750 *F.Supp.* at 1350–51, 1353–56; *Alcolac, Inc. v. St. Paul Fire & Marine Ins. Co.,* 716 *F.Supp.* 1541, 1543 (D.Md.1989); *American Mut. Liab. Ins. Co. v. Neville Chem. Co.,* 650 *F.Supp.* 929 at 932–33; *County of Broome v. Aetna Casualty & Sur. Co.,* 146 *A.D.*2d 337, 540 *N.Y.S.*2d 620, 622–23, *appeal denied,* 74 *N.Y.*2d 614, 547 *N.Y.S.*2d 848, 547 *N.E.*2d 103 (1989). The relevant cases are collected in Chesler et al., *supra,* 18 *Rutgers L.J.,* which contains this overview of the decisional law:

> The courts frequently look to the quality of the underlying conduct where constructive intent is not readily apparent. If the insured takes reasonable precautions to prevent possible damage or acts promptly to remedy and prevent the reoccurrence of actual damage after its discovery, the courts have been inclined to find that the damage is unintentional and caused by accident. Conversely, coverage is generally denied when an insured takes no steps to avoid conduct which has a high risk of causing damage. For example, insureds in cases involving continuing nuisances have often been denied coverage because they were informed of, or knew of, the damage that they were causing but failed to take any remedial or preventive measures.

[*Id.* at 23 (footnote omitted).]

We are thoroughly persuaded that summary judgment was properly granted, there being no material disputed facts concern-

ing whether Morton's predecessors had *expected* to cause environmental damage to Berry's Creek and the surrounding area. Without determining that such damage was intended, we find inescapable the conclusion that damage qualitatively comparable to that found to exist in the *Ventron* litigation must have been anticipated by Morton's predecessors on the basis of their prolonged knowledge of and avoidance of compliance with complaints by regulatory officials that the company was discharging unacceptable emissions, including mercury compounds, into Berry's Creek. Based on that conclusion, we concur with both the trial court's and Appellate Division's determination that as a matter of law the property damage to Berry's Creek and the surrounding area was not caused by an "occurrence" within the meaning of the term in the various CGL policies. We agree with the Appellate Division's observation that the trial court "would have ignored reality to conclude that plaintiff's predecessors did not know that the mercury and its effluent was harmful to the land over which it coursed and the waters into which it fell." 266 *N.J.Super.* at 334, 629 *A.*2d at 913.

Finally, we reject Morton's contention that certain of its insurers breached their duty to defend its predecessors in the *Ventron* litigation, asserting that the duty to defend is broader than the duty of indemnification, and observing that at least some of the allegations set forth in the *Ventron* complaint were within the policies' coverage obligations. The Appellate Division addressed those contentions, concluding that this Court's decisions in *Hartford Accident & Indem., supra,* 98 *N.J.* at 24–25, 483 *A.*2d 402, and *Burd, supra,* 56 *N.J.* at 388–90, 267 *A.*2d 7, were controlling and dispositive of Morton's contentions. 266 *N.J.Super.* at 340–345, 629 *A.*2d at 917–920. We are fully in accord with the Appellate Division's determination of the duty-to-defend issue.

## IV

The judgment of the Appellate Division is affirmed. No costs.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK and O'HERN—4.

*Opposed*—None.